

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### AP-74,393
---

**IRVING ALVIN DAVIS, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL FROM CAUSE NO. 20010D06419
### IN THE 168TH DISTRICT COURT
### EL PASO COUNTY
---

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. KEASLER, J., concurred in the result of point of error three and otherwise joined the opinion of the Court. KELLER, P.J., concurred in the result.

## O P I N I O N

In June 2002, appellant was convicted of murdering Melissa Medina in the course of committing or attempting to commit aggravated sexual assault.[1]  Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the

---

[1] TEX. PENAL CODE § 19.03(a)(2).

trial judge sentenced appellant to death. Art. 37.071, § 2(g).[2] In June 2007, we affirmed the trial court's judgment as it related to appellant's conviction, reversed it as it related to his punishment, and remanded the case to the trial court for a new punishment hearing. *Davis v. State,* No. AP-74,393 (Tex. Crim. App. June 13, 2007)(not designated for publication). In February 2008, the trial court held a new punishment hearing before a new jury. At the conclusion of that hearing, the trial court, acting in accordance with the jury's answers to the two special issues, again assessed appellant's punishment at death. Appellant now raises nine issues on direct appeal from the second punishment hearing. After reviewing appellant's points of error, we find them to be without merit and affirm the trial court's judgment.

## EVIDENCE OF SATANISM

In point of error one, appellant argues that "the trial court erred when it allowed the state to present evidence that appellant had become a Satanist while imprisoned on death row." He specifically complains that the trial court erred by admitting state's Exhibits 247, 248, and 285 through 301, permitting the testimony of state's expert witness Donald Haley, and requiring appellant to display to the jury the tattoo of a pentagram on his chest. Appellant raises both constitutional and statutory claims, arguing that the trial court violated the First Amendment to the United States Constitution and Rules 401 and 403 of the Texas Rules of Evidence. Because appellant bases his single point of error on more than one legal theory, his entire point of error is multifarious. TEX. R. APP. P. 38.1. We will, however, review his arguments in the interest of justice.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Walters v. State,* 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). The trial court abuses its discretion

---

[2] Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

only when the decision lies "outside the zone of reasonable disagreement." *Id.*

Prior to trial, anticipating that the state would "attempt to offer into evidence expert testimony indicating Defendant's religious beliefs," appellant filed a motion in limine asking the trial court to bar testimony on that subject. At the hearing on the motion in limine, defense counsel argued that the state should not be allowed to get into "the issue of satanism" because it was not relevant, it would violate his rights to freedom of religion and freedom of association, and its probative value was outweighed by any prejudicial effect. Defense counsel further stated,

> [I]t's my understanding that the type of satanic beliefs that my client does profess are, in fact, nonviolent and do not involve any violence at all. And that's just their different, I guess, churches or ways to practice this satanism. And so unless they can tie my client in to, you know, I guess these bad acts that they're going to attempt to produce, I don't think there's any relevance there. . . .

> I believe, based on my argument as to the various different, I guess, sections of satanism that you might have, I think that's exactly the problem they're going to run into in this case, that they're not going to–you know, they're going to basically try–they're going to be trying to say that the mere fact that he's a satanist is a bad act in its own right, and that's not appropriate pursuant to *Dawson v. Delaware.*[3]

The prosecutor responded that the state intended to introduce appellant's prison records, writings, drawings, and "a pentagram that is etched into his body that was either carved or burned" to show that, in 2006, appellant had declared that he had been a Satanist since 2005. The prosecutor added, "We have evidence that will come in through our expert witness that he will testify about satanists and illegal activities and violent activities that have been committed on the part of satanists." The prosecutor explained that "there is no need for the State to prove that the Defendant himself engaged in all of those illegal violent acts, only that the group is known to do that, and that the Defendant is a member of that group." The prosecutor further stated that appellant's "belief in

---

[3] 503 U.S. 159 (1992).

satanism is being offered as evidence of his character, to show his belief systems" and how they relate to future-dangerousness; the issues of character and future dangerousness "are at the heart of the sentencing phase in a capital murder case." Following the parties' arguments, the trial court granted the motion in limine "until such time as [the state's] expert can establish outside the hearing of the Jury that, in fact, there is a propensity in this organization or this faith or this religion . . . for illegal activities or an [sic] engaging in violent activities."

The state's expert witness, Donald Vaughn Haley, later testified on voir dire examination outside the presence of the jury that Satanism advocates violence, as evidenced by the discussion of human sacrifice in *The Satanic Bible* and the "rituals of destruction" contained in *The Satanic Rituals*. Haley also gave several examples of people who committed murder and mutilation "in the name of Satan." Over defense counsel's objections on relevance and the First Amendment, the trial court ruled that Haley would be permitted "to testify in the area of the satanic religion" and that "all of that evidence is relevant to the issue of future dangerousness and it is outside the protection of the First Amendment." Appellant also filed written objections to the court's ruling, arguing that the evidence was "irrelevant" and that its admission violated Rule 403 and his rights of freedom of religion and freedom of association under the First Amendment of the United States Constitution.

At trial, the state offered into evidence various items obtained from appellant's prison cell, including five books (state's Exhibits 285-289), three writing tablets (state's Exhibits 290, 291, and 293), seven drawings (state's Exhibits 294-299 and 301), and a handwritten note (state's Exhibit 300). The books were entitled *Necronomicon*, *The Secret Life of a Satanist*, *Satan Speaks!*, *The Satanic Rituals*, and *The Satanic Bible*. Appellant's writing tablets and drawings contained Satanic imagery and references, including lists of "Satanic statements," "Satanic rules," and "Satanic sins."

One of appellant's drawings depicts a naked woman who is bound and gagged, and another drawing depicts a woman with a slashed throat. In the handwritten note, which appellant described as "a suplement [sic] to my application to the Church of Satan," appellant expressed his desire to pledge allegiance to the Church of Satan. The state also offered into evidence appellant's grievance forms (state's Exhibit 247) and other records (state's Exhibit 248) from the Texas Department of Criminal Justice (TDCJ). In a grievance form received by TDCJ on June 19, 2007, appellant stated that he had been a Satanist since 2005, that he was also a "blood sorcerer" who had taken up vampirism, and that he was without the materials that he needed to practice his religion. Other records showed that, in 2006, appellant asked TDCJ to change his religion on his travel card from Buddhist to Satanist and that in 2007 he requested that "Vampirism/Thaumaturgy" be entered in addition to Satanism. The state also demonstrated that appellant had an inverted pentagram on his chest by having appellant lift his shirt and stand before the jury.

When Dr. Haley testified before the jury, the state asked him about "the philosophy of satanists regarding human sacrifice." Haley responded with passages from *The Satanic Bible*.

> It says, "The only time a satanist would perform a human sacrifice would be if it were to serve a twofold purpose; that being to release the magician's wrath in the throwing of a curse, and more important, to dispose of a totally obnoxious and deserving individual." . . . It states, "The question arises, 'Who, then, would be considered a fit and proper human sacrifice, and how is one qualified to pass judgment on such a person?' The answer is brutally simple. Anyone who has unjustly wronged you or who has gone out of his way to hurt you–to deliberately cause trouble and hardship for you or those dear to you." . . . "When a person, by his reprehensible behavior, practically cries out to be destroyed, it is truly your moral obligation to indulge, then, their wish."

Haley explained that the "Nine Satanic Statements" represent "the canon or standard by which a satanist lives his life." When asked about the "Eleven Satanic Rules of the Earth," Haley

replied,

> Based on my study, the ones that–it would have to be that if an individual annoys you, to treat him cruelly. And the other thing, if an individual bothers you, it says in there, to ask him to stop, and if they don't stop, it says–it used the word destroy them. It says destroy.

Haley testified that to destroy a person means to cause their death. Defense expert John Gordon Melton disagreed with Haley's definition. Melton testified that, according to Anton LaVey, the author of *The Satanic Bible*, to destroy a person means to "symbolically curse them." Melton, however, acknowledged on cross-examination that there are some Satanists who believe that Satan is a negative personal antideity, and that that particular type of Satanism has "very negative social and personal effects," including people being killed in the name of Satanism.

We first address appellant's constitutional claim. The First Amendment guarantees the freedoms of religion and association. *See Casarez v. State,* 913 S.W.2d 468, 476-78 (Tex. Crim. App. 1994); *Mason v. State,* 905 S.W.2d 570, 576 (Tex. Crim. App. 1995). It protects an individual's right to join groups and to associate with others holding similar beliefs. *Mason,* 905 S.W.2d at 576 (citing *Dawson v. Delaware,* 503 U.S. 159, 161 (1992)).[4] However, the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because those beliefs and associations are protected by the First Amendment. *Id.* Such evidence may be admissible if it is shown to be relevant to the issues involved in the case. *Id.* at 576-77. Future dangerousness is an issue that is relevant to the sentencing stage of a capital-murder trial. *Id.* at 577.

---

[4] Appellant asserts that this is not a gang case and that his primary concern is not one of freedom of association but that of freedom of religion. He contends that *Mason* is inapposite because it is a gang case. However, *Mason* cites and relies on *Dawson v. Delaware,* which is the seminal case with regard to First Amendment freedoms of religion and association. 905 S.W.2d at 576. Appellant fails to persuade us that the reasoning of these cases should not apply to religious affiliations like the one at issue here.

In order to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. *Mason,* 905 S.W.2d at 577 (citing *Dawson,* 503 U.S. at 163-67). The state introduced TDCJ records showing that appellant had identified himself as a Satanist since 2005. Haley testified that some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in appellant's cell discussed "rituals of destruction" for performing "human sacrifice" on "undesirable [and] obnoxious individual[s]," and that various people had committed murder and mutilation "in the name of Satan." Although Melton disagreed with Haley's definition of the term "destroy" and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of Satanism. It was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment.

We next turn to appellant's statutory claims. Relevant evidence is that which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401. Appellant's Satanic tattoo, books, writings, and drawings are indicative of his character, and we have held that such evidence is relevant to the question of future dangerousness at punishment. *Conner v. State,* 67 S.W.3d 192, 201 (Tex. Crim. App. 2001); *Corwin v. State,* 870 S.W.2d 23, 25 (Tex. Crim. App. 1993); *see also Robles v. State,* No. AP-74,726, 2006 WL 1096971 (Tex. Crim. App. April 26, 2006)(not designated for publication).

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more

probative than prejudicial. *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). "The term 'probative value' refers to the inherent probative force of an item of evidence–that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation–coupled with the proponent's need for that item of evidence." *Casey v. State,* 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 880. All testimony and physical evidence are likely be prejudicial to one party or the other. *Jones v. State,* 944 S.W.2d 642, 653 (Tex. Crim. App. 1996). It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable. *Williams,* 958 S.W.2d at 196.

The probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society was a "fact of consequence" in this punishment trial. Art. 37.071, § 2(b)(1). In the instant case, appellant brutally raped, beat, and strangled a fifteen-year-old girl and then cut off her fingertips to remove potential DNA evidence. The state presented evidence that, in the past, appellant had displayed aggressive behavior, had been in trouble at school, and had been placed on probation for a theft offense in North Carolina. Defense counsel argued, "Maybe he wasn't a good person back then, but he's a good person now," pointing out that "he's been trying to do the right things" since he was incarcerated and that he had no documented incidents of violence in prison. The evidence that appellant became a Satanist while in prison helped to rebut that defense argument.

As the prosecutor stated in closing argument, evidence of appellant's affiliation with Satanism was "another piece of the puzzle" for the jury to consider when answering the special

issues. This evidence was one of the factors that affected the probability that appellant would be a danger in the future, just like the facts of the offense that he committed and his prior history and violent artwork. It was not so prejudicial that there was a clear disparity between the degree of prejudice and its probative value. Thus, the trial court did not abuse its discretion in admitting this evidence. Point of error one is overruled.

## CHALLENGES FOR CAUSE

In point of error two, appellant alleges that the trial court improperly denied his challenges for cause against venire members Sharon Ann Neumann, Alejandro Melero, and Luis Romo. Appellant alleges that these venire members were challengeable for cause under Article 35.16 because they were biased either against appellant or against some part of the law upon which he was entitled to rely. Art. 35.16(a)(9) and (c)(2).

To preserve error for a trial court's erroneous denial of a challenge for cause, appellant must show that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Green v. State,* 934 S.W.2d 92, 105 (Tex. Crim. App. 1996). Appellant has properly preserved error with respect to each of the challenged venire members.

If a trial judge errs in overruling a challenge for cause against a venire member, then a defendant is harmed if he uses a peremptory strike to remove the venire member and thereafter suffers a detriment from the loss of the strike. *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). Appellant was denied any additional peremptory strikes. To demonstrate harm, appellant must show that the trial court erroneously denied one challenge for cause. *Chambers v.*

*State,* 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

When reviewing a trial court's decision to deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the ruling. *Feldman,* 71 S.W.3d at 744. The test is whether a bias or prejudice would substantially impair the venire member's ability to carry out the juror's oath and judicial instructions in accordance with the law. *Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). Before venire members may be excused for cause, the law must be explained to them, and they must be asked whether they can follow that law, regardless of their personal views. *Id.* The proponent of a challenge for cause has the burden of establishing that the challenge is proper. *Id.* The proponent does not meet this burden until he has shown that the venire member understood the requirements of the law and could not overcome his or her prejudice well enough to follow the law. *Id.*

We review a trial court's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a venire member's demeanor and responses. *Id.* at 295-96 (citing *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998)). A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* at 296. When a venire member's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision*. Id.*

### Sharon Ann Neumann

Appellant claims that Neumann was biased against him because she "was uncomfortable with Satanism" and she "described the religion as evil and contrary to everything [she] believe[d]." When defense counsel questioned Neumann about her religious affiliations, she stated that she was a practicing Christian. Defense counsel then continued to question Neumann.

Q.      Now, what if I told you that in the last two years, since 2005, I have changed from a devout Catholic to a fervent satanist?

A.      Okay.

Q.      Okay.  It's a drastic change.

A.      It's huge.

Q.      Okay.  Are you still okay with that?

A.      That makes me uncomfortable.

Q.      Why?

A.      Because it's contrary to everything I believe.

. . .

Q.      I'm sure there's some satanists that have committed some very, very violent acts.  Does that make everybody who's a satanist evil?

A.      I don't–I think they're evil because they're satanist, not because they committed the violent act.

Q.      So anyone who's a satanist is evil?

A.      I think they worship evil.  To me, Satan is equivalent to evil, being raised the way I've been raised.

. . .

Q.      So anyone who's a satanist is evil, in your opinion?

A.      I think they worship evil.  I think they could come across as a typical citizen most times . . ..

. . .

Q.      But when it comes to satanists, they–you feel that they worship evil?

A.      I think if they're true satanists, they worship evil.  But I don't know that it would come out all the time.  At some point it would.  But I don't know much about that, so . . ..

Neumann further stated that her son had roomed with a satanist for a short time when he was in college, which made her "very unnerved." However, she stated that "nothing bad ever happened," and her son "was not hurt in any way." Thus, she agreed that her only one-on-one encounter with a Satanist had been peaceful. Finally, Neumann acknowledged that even if she learned that appellant was a Satanist, she could still be fair and impartial and base her decision on the evidence.

Defense counsel challenged Neumann for cause, arguing that she could not be fair because she was "shocked" about the possibility that appellant might be a Satanist and she said that Satanism was "everything contrary to her belief system." The trial court denied the challenge, and the record supports the trial court's ruling. Neumann ultimately stated that she could follow the law, regardless of her personal views. Appellant has failed to meet his burden to show that Neumann had a bias or prejudice that would have substantially impaired her ability to carry out her oath and instructions in accordance with the law. *See Gardner,* 306 S.W.3d at 295.

*Alejandro Melero*

Appellant complains that Melero was biased because he "was leaning towards death over life" and he "expected Appellant to prove that the death penalty was not appropriate." Any venire member who would automatically answer the future-dangerousness special issue in the affirmative or who would place the burden of proof on the defense is challengeable for cause under Article 35.16(c)(2) for having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely. *Feldman,* 71 S.W.3d at 745.

Appellant specifically complains about Melero's responses to defense counsel's questioning.

Q.     In your questionnaire you stated that you're in favor of the death penalty, right?

A.     Yes.

Q. When you say you're in favor of it, what do you mean by that?

A. I believe it's an appropriate punishment if someone is found guilty of it and that's the punishment given to them, it's fair.

Q. Is it fair to say you're leaning towards giving death over giving life, right?

A. Yes.

Q. And, I mean, you were asked about this statement. "Any person, man or woman, young or old, who commits capital murder, should pay with his own life," right?

A. Yes.

Q. You put that you agree with that, right?

A. Yes.

Q. You feel pretty strongly about that, right?

A. Yes, sir.

. . .

Q. Okay. Now, you were asked, well, can you wait to hear all the evidence, okay?

A. Yes.

Q. You were asked that statement earlier. And you're open to the possibility that we might be able to provide some reason to not give the death penalty, right?

A. Yes, sir.

Q. Okay. But in reality, you're going to expect us to prove to you that the death penalty is not the appropriate way to go, right?

A. Yes.

Q. If we can't prove to you that the death penalty is not appropriate, then in your opinion it should be the death penalty, right?

A.  Yes.

Q.  And you understand that that's a little bit different than the way [the] law works, right?

A.  In what aspect?

Q.  Well, in the aspect that they have to prove to you that the death penalty is appropriate.

A.  Okay.  Yes, sir.

Q.  And in your mind it should be the reverse, right?  If you kill someone, you've got to prove to me that you should live, right?

A.  Yes.

. . .

Q.  Okay.  And by the same token, in this case your initial, you know, your inclination is to say that death is appropriate unless the Defense can prove otherwise, right?

A.  Yes, sir.

Q.  So you're going to put the burden on us to prove to you that he should live, right?

A.  Yes, sir.

Q.  And you feel pretty strongly about that, right?

A.  Yes, sir.

Defense counsel then explained to Melero that "[t]he first question the State has to prove to you beyond all reasonable doubt . . . [is] that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Defense counsel explained that "[i]f they don't prove that to you regardless of what we do, we present no evidence at all, if they don't prove it, then the answer has to be no."  Defense further questioned Melero.

Q.    I'm asking you about your opinion.  Do you have an opinion already as to what the answer to question 1 is?

A.    No.  I say I have to listen to what the evidence is presented on it to see if it was reasonable or if they could prove it, that that was–that he would show a threat to that.  I'm open to the fact that if you're going to present the evidence to that, to show me otherwise, then that's, I think, a fair thing to do.

. . .

Q.    You see where we're at, right?  I mean, you're telling me that on the one hand you expect us to convince you of something.  On the other hand you're saying I would wait to listen to the evidence and then make–there's a–do you see the conflict there?

A.    Yes, sir.

Q.    So I guess my question, I'll just ask you.  Which way is it?  Do you expect us to unconvince you or . . ..

A.    Based on what I'm hearing from them, I would expect them to show me, you know, giving me the burden of proof that they have that.  They're supposed to show me on that.

Q.    That's the law, okay?

A.    Yes.

Q.    And that's the law and eventually, I mean, I'll ask you that question, okay?

A.    Okay.

Q.    That's the law that you're required to follow.  My question is, you know, based on the way you want to see it happen in your mind, okay, or the way you feel it should happen, that we should unconvince you, okay?

A.    I'm not sure that's fair to say.  Again, when I answered these questions, there were things -- you know, you're asking my opinion–

Q.    Right.

A.    –at the time.  You're talking having sat in there for four hours.  It's kind of – a little hard to get your mind together on a lot of things.  Hearing now what you're telling me, then that shows me that, you know, the way it's supposed

to go and how it's supposed to be. Based on hearing that, I'm willing to be open to see the burden of proof and follow the law like you said to see what it shows.

When defense counsel further questioned Melero after this exchange, Melero continued to acknowledge that he would follow the law and hold the state to its burden of proof on the future-dangerousness special issue. Defense counsel then challenged Melero for cause, arguing that he was biased in favor of the state, that he would expect the defense to "unprove that [appellant] should be subject to the death penalty," and that "his opinions were very strong in favor of the death penalty." The trial court denied the challenge for cause.

The trial court did not abuse its discretion by denying appellant's challenge for cause to Melero. When defense counsel explained the law to him, Melero agreed that he could set aside his personal opinions and follow the law requiring the state to prove the future-dangerousness special issue beyond a reasonable doubt. Appellant has not shown that Melero had a bias that would have substantially impaired his ability to carry out his oath and instructions in accordance with the law. *See Feldman,* 71 S.W.3d at 744.

*Luis Romo*

Appellant contends that Romo was biased against him because Romo "had a bad experience with an uncle possessed by the devil" and "[h]e admitted the incident would sway how he would view evidence of Satanism." In response to defense counsel's initial questioning, Romo stated that he did not consider Satanism a religion, that a person should not be able to practice Satanism as a religion, and that it would affect him as a juror if he found out that the defendant was a Satanist. Then the prosecutor questioned him further on this topic.

Q.      Satanism. Do you know something about this?

A.     I mean, what I've seen and heard.

Q.     Okay.  Here's a little law in our court.  You shouldn't prejudge evidence.  Okay?  Just like you shouldn't prejudge people.  Remember we talked about a policeman can come in here or a priest or whatever.  We don't want you to judge them by who they say they are.  We want you to wait, listen to the evidence, and then decide.  Remember that?

A.     Yes, sir.

. . .

Q.     Right now you haven't heard any evidence about satanism, whether it's a religion or not.  Is that correct?

A.     Yes, sir.  I mean, I have bad persons, but you know, I'm just taking it from my persons it's something bad.

Q.     Tell me about that.  What's the bad?

A.     Something I'd rather keep within myself.

Q.     No, you've got to tell us here.  Well, let me ask it this way.  Is it something so bad -- here's going to be the ultimate question.  This satanism thing, you haven't heard any evidence of it here in this courtroom yet.  So here's the rule of law.  Don't prejudge it until you hear about whatever the satanism is here, okay?

A.     Yes, sir.

Q.     Now, do you think you can do that?

A.     Yes, sir.  I mean, if he's here, he's got to present whatever he's got to present.  You're judged by what they present.

Q.     You may not hear anything about satanism.  And if you don't, good and fine.  If you do, though, you've got to rule or make your judgments about the evidence that you hear in this courtroom about those things.  Does that make sense to you?

A.     Yes, sir.

Q.     Okay.  Can you do that?

A.      Yes, sir.

Q.      Okay. So whatever has happened to you, whatever the story is with satanism, whatever that is, this is what the law would require you to do, if you can. Put it aside, wait and hear about this satanism that happens here, if you hear about it. Can you do that?

A.      Yes, sir.

Q.      You sure?

A.      I mean, I can hear it, judge by what I hear.

Q.      That's what the law requires you to do, if you can do that. And you're saying you can do that, is that correct?

A.      Yes, sir. I feel confident I can do that.

Q.      Okay. All right. What you can't have, according to the law, is a bias or prejudice against somebody before you even hear the evidence, understand?

A.      Yes, sir.

. . .

Q.      Right now you can believe anything you want. We're welcoming your opinions. If you're a juror in this case, the requirement will be that you wait. From the evidence in this case, make your decisions about satanism or whatever else comes in based upon the evidence that comes in in this case. And can you do that?

A.      Yes, sir.

Q.      So ultimately, the question becomes this. Are you able to set aside your whatever biases or prejudices or feelings or knowledge you have about satanism? Wait to learn about it from this case, if you do, and then apply it in that case. Can you do that?

A.      Yes, sir. Yes, sir.

Q.      So let's say you were to hear about satanism in a case. This is before you've heard any evidence. Are you able to weigh all of the evidence in a case to come to whatever your conclusions are to question number 2, regardless?

A.    Yes, sir.  I think I could.

Q.    Well, I need a little more sure than think, if you can.

A.    Yes, sir.  I mean, I can.

Defense counsel then asked Romo what experiences he had with Satanism.  Romo stated that he "just had a bad experience [on] one occasion," and he refused to discuss it.  He agreed that Satanism was evil and that it should not be practiced in the United States.  When defense counsel asked if this would affect him as a juror, Romo stated:  "I mean, I can hear the case and if it's a case, it's a case.  And I feel I can wait till [sic] they prove all the evidence and I can decide what to do, I guess, in that occasion."

Defense counsel then challenged Romo for cause due to his bias against Satanism.  The trial court denied the challenge, but later granted defense counsel's request to bring Romo back for further questioning regarding his "bad experience" with Satanism.

> Well, I mean, I just–I was at my house and we had visit[ors] over, and one of my uncles got into it with my father.  And we had just a little family dispute and my uncle was really into stuff like that, you know, into doing his, I guess what you call satanism or whatever it is.  And he went into some sort of language that he spoke.  And when he walked out, when we threw him out of the house, he left.  And when he left, maybe two seconds later, he returned and he's got a mark on his back, like three little drawings.

> And he came in and, I mean, it's just the way he came in and approached us, you know.  He said he was the devil, he was going to get even, and, you know, and there's standard ways of doing things.  And I mean, just a view of his face, really, wasn't what we expected him to be, you know.  And it's well recorded in my head what he looked like and what he did, you know.  I mean, I've always held that I really don't want to really discuss in real big details on what–I mean, this was back about maybe–I was about 14, so you're talking about 15, 16 years ago, maybe a little more.  And it's just very uncomfortable for me to discuss this because I mean, backtracks me, you know, and it's just very bothersome for me and, I mean, this is something–I mean, I don't know, it just makes me very, very uncomfortable.

When defense counsel continued to question Romo after this point, Romo agreed that his bias

against Satanism would affect how he viewed the evidence. Upon further questioning by the state, however, Romo agreed that he would listen to the evidence and base his decision on that alone. Defense counsel then pointed out, "You say it won't affect you, but you said it would affect you." Romo replied that he would listen to the evidence and that he would not make decisions based on what had happened to him. Finally, the trial court questioned Romo.

> THE COURT: Under the law the juror is required to render a verdict solely on the evidence that they hear. And they will be specifically instructed they cannot refer to any personal experiences, any expertise that they might have, things of that nature. In other words, you can't go to the jury and say, oh, this happened to me. You can't do that. That's not the evidence in this case.
>
> [ROMO]: Yes, sir.
>
> THE COURT: Could you follow that instruction?
>
> [ROMO]: Yes, sir.
>
> THE COURT: Could you set aside that prior experience that you had when you're analyzing the evidence, whatever it is?
>
> [ROMO]: Yes, sir.

Following this exchange, defense counsel again challenged Romo for cause due to his bias against Satanism. The trial court again denied the challenge.

The record supports the trial court's ruling. We accord particular deference to the trial court's ruling when a venire member vacillates in his or her answers. *Gardner,* 306 S.W.3d at 296. Although Romo vacillated in his answers, he ultimately stated to the trial court that he could set aside his bias and follow the law. Point of error two is overruled.

## EXPERT TESTIMONY

In point of error three, appellant contends that the trial court erred in allowing Donald Haley,

the state's expert on Satanism, to testify about the Satanic religion and the beliefs and practices of its practitioners. Rule 702 of the Texas Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, [then] a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Alvarado v. State,* 912 S.W.2d 199, 215-16 (Tex. Crim. App. 1995). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela v. State,* 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). Appellant argues that the state failed to demonstrate that Haley was qualified or that his expert testimony was reliable.

Qualification is a two-step inquiry. *Id.* A witness must first have a sufficient background in a particular field, and a trial judge must then determine whether that background goes to the matter on which the witness is to give an opinion. *Id.* The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Id.* at 132. The focus is on the fit between the subject matter at issue and the expert's familiarity with it. *Id.* at 133. Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case. *Id.* at 136.

Haley testified on voir dire examination that he had associate's degrees in criminology and administration of justice, a bachelor's degree in criminology, and a master's degree in public administration with a concentration in justice administration. He was employed as the Director of Administration of Justice at Tidewater Community College in Virginia Beach, Virginia, where he had taught multiple courses that included the subject of Satanism.[5] He had previously worked at a Virginia state prison, the Virginia Beach Sheriff's Office, the Chesapeake Police Department, and the Virginia Beach Police Department. He had studied and researched Satanism since 1989, and he had taught and provided expert consultation on this subject to police officers and FBI agents. He had taught 78 people from various agencies in a two-day course on "satanism, the occult, and the black arts" at regional academy in El Paso County, and had written a manual that he used when teaching classes on Satanism to law-enforcement officers and personnel. He had never before testified as a Satanism expert, but he was considered an expert on the subject by the Virginia Gang Association and the college where he worked. When asked if there were "any publications on satanism that have been part of [his] studies," he named numerous articles and books, including *The Satanic Bible*, *In the Name of Satan*, *Satan Speaks!*, *The Book of Thelema*, *The Devil's Dictionary*, and the *Dictionary of Satanism*, and he expressed familiarity with the "Nine Satanic Sins" and the "Eleven Satanic Rules of the Earth." He gave specific cases in which he had advised law-enforcement personnel on the subject of Satanism, and he named other experts with whom he had conferred about cases involving Satanism. When asked if he had found documentation and evidence "that members of the satanic religion have a philosophy or belief system advocating violence," he testified about the

---

[5] Haley explained that "administration of justice . . . is a synonymous term with a criminal justice program."

discussion of human sacrifice in *The Satanic Bible* and the rituals of destruction in *The Satanic Rituals*. When asked if he had researched any "satanists that have committed illegal or violent acts," he gave the examples of California serial-killer Richard Ramirez and the murder of a teenage girl that was written about in the book entitled *In the Name of Satan*. When asked if he knew of cases "of either death or mutilation by satanists," he repeated these two examples and added several more. At the conclusion of voir dire examination, the trial court ruled that Haley could "testify in the area of the satanic religion and to its religious philosophies and to whatever it is that the [Satanic] Bible permits or recommends or all of those things that you talked about."

Appellant contends that Haley was not qualified to testify as an expert because he "had never taken any classes on Satanism," he "had absolutely no theological training," and he "had never written any articles on the subject." Haley acknowledged that he had not taken any formal courses in Satanism while obtaining his degrees, but he testified that he had spent approximately 19 years studying that subject. Although Haley confirmed that he had not written any formally published articles about Satanism, he testified that he had authored a 50-page manual that he used when teaching classes on that topic. Given Haley's years of researching, studying, teaching, and advising about the subject of Satanism, we conclude that the trial court did not abuse its discretion in permitting Haley to testify over appellant's qualification objections.

We next turn to appellant's claim that Haley's testimony "could not be shown to be reliable." The reliability of "soft" science evidence may be established by showing that: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on*

*other grounds by State v. Terrazas,* 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). The evidence shows that Haley's expert testimony was reliable under *Nenno.* Haley was considered an expert on the subject of Satanism by Tidewater Community College and the Virginia Gang Association, had conferred with other experts on the subject in various cases, and had spent years teaching the subject to college students and law-enforcement personnel. He had read numerous articles and books on the subject, and his testimony regarding Satanic philosophy relied directly upon these sources. The trial court did not abuse its discretion in admitting Haley's expert testimony over appellant's reliability objections. Point of error three is overruled.

### *BATSON* CHALLENGE

In point of error four, appellant argues that the trial court erred in overruling his *Batson* objection to the State's peremptory strike against prospective juror Jason Cofield. *Batson v. Kentucky,* 476 U.S. 79 (1986). Appellant asserts that "the State's professed reasons for striking juror Cofield were contrived in order to conceal racially discriminatory intent" and that the trial court's ruling was clearly erroneous.

A defendant who objects under *Batson* must make a *prima facie* showing of racial discrimination in the state's exercise of its peremptory strikes. *See Herron v. State,* 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); *see also Mathis v. State,* 67 S.W.3d 918, 924 (Tex. Crim. App. 2002). The burden then shifts to the state to articulate race-neutral explanations for its strikes. *Id.* Once the prosecutor has articulated race-neutral explanations, the burden shifts back to the defendant to show that the explanations are a pretext for discrimination. *Id.* The trial court must then determine whether the defendant has carried his burden of proving discrimination. *Id.* The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly

erroneous. *Id.*

In the instant case, we need not address whether the appellant established a *prima facie* case. Where, as in this case, the prosecutor has articulated his reasons for the challenged peremptory strike and the trial court has ruled on the ultimate question of intentional discrimination, that issue becomes moot. *Young v. State,* 283 S.W.3d 854, 866 (Tex. Crim. App.), *cert. denied,* 130 S. Ct. 1015 (2009). We review the record of a *Batson* hearing and the *voir dire* examination in the light most favorable to the trial court's ruling. *Id.*

When appellant objected to the state's peremptory strike against Cofield under *Batson*, the prosecutor articulated the state's reasons for the strike.

> Mr. Cofield, my notes indicate[,] said this to us. One, it's never too late for people to change. Anyone can change. That was the first thing he said.
>
> And then when he was spoken to about the burden of proof, he said these things. He said he needed an enormous amount of evidence, that–he was asked by Counsel for Defense if the fact of the murder itself weighed with him and he said, I'm not even close, based on stating of the crime, that I need an enormous amount of evidence. And for all those reasons we struck him, because it looked like he was putting some kind of, one, weight number on the evidence, and he was requiring us to do something that, at least in my opinion, that we don't have to do, as I've maintained throughout the entire trial.
>
> A juror can, if he wishes, find a person guilty and answer 1 and 2 based upon the evidence of the crime alone. I thought I had case law to support that and he disagrees with that so I disagree with him.

Following the prosecutor's explanation, the trial court denied appellant's *Batson* challenge with regard to Cofield.

Appellant engages in a comparative analysis on appeal to show that the State's reasons for striking Cofield were actually a pretext for discrimination. He argues that prospective jurors Sharon Ann Neumann and Irma Medina answered in a similar fashion regarding the amount of proof they

needed to affirmatively answer the future-dangerousness special issue. However, the *voir dire* record demonstrates that these two prospective jurors ultimately agreed to require the state to prove future dangerousness beyond a reasonable doubt.

Appellant contends that Neuman "indicated that she would have to be '99.999' [percent] sure before she could impose the death penalty." The prosecutor initially pointed out during voir dire that Neumann stated in her jury questionnaire that she believed in the death penalty for an "[i]ntentional killing of an innocent person if there is irrefutable evidence such as [a] DNA match." The prosecutor expressed concern that Neumann's use of the term "irrefutable" meant she would require the state to prove its case "beyond all doubt" instead of "beyond a reasonable doubt." Neumann replied,

> I guess for me it would take something such as a DNA test with something like a 99.999 percent chance, and everything else pointing to it. You know what I'm saying? With nothing in mind, in addition, I guess, to the testing. There would have to be nothing in my mind that makes me think, no, he didn't do it, or, no, it wasn't that way.

The prosecutor then reminded Neumann that another jury had already determined that appellant was guilty of capital murder, and that she would "not be able to disagree with whether or not he committed capital murder because [she would] be instructed that that is the fact of the matter." Neumann expressed her understanding of this concept. When later questioned by defense counsel, she acknowledged that she understood the term "beyond a reasonable doubt" and that she would hold the state to that burden when deciding the issue of appellant's future dangerousness.

Appellant contends that Medina "made a statement that she needed to be really convinced before she could find in favor of the State." The prosecutor initially explained to Medina that the state had to prove the future-dangerousness special issue beyond a reasonable doubt, and Medina indicated her understanding of this concept. When defense counsel later asked Medina how much

proof she would require from the state in order for her to affirmatively answer the future-dangerousness special issue, she replied, "How much? Needs to really convince me." Defense counsel then reiterated that the standard of proof was "beyond a reasonable doubt." Like Neumann, Medina stated that she understood the standard of proof and that she would hold the state to that standard when answering the future-dangerousness special issue.

Cofield, however, testified that he would require more proof in order to affirmatively answer the future-dangerousness special issue. The prosecutor questioned Cofield about his ability to answer the special issues.

> Q. And I think it told you in the questionnaire that, you know, he was found guilty of murdering someone while in the course of committing or attempting to commit aggravated sexual assault.
>
> A. All right.
>
> Q. So that's already a done deal.
>
> A. Correct.
>
> Q. That's not something you're going to decide.
>
> A. Right.
>
> Q. And you know, I'm not saying that–well, my question to you is, based on that alone, is that already enough, you know, based on that, have you already made up your mind one way or the other?
>
> A. No, because I still don't know–I know what he's been guilty of, but I still don't have enough evidence to sit here and make a decision as–type of decision that you guys are asking us, or asking me as a possible juror to make. It's got to be a lot. It's got to be enormous, enormous–enough evidence to sit here and make that type of decision. I'm not going to say it's going to happen overnight. It's a tough decision.
>
> . . .
>
> Q. I was saying, but you need more than a simple fact that the crime was

committed, right?

A. Correct.

Q. You're basically going to look at all the evidence that's presented to you. And you're willing to do that, right?

A. Correct.

Q. That's what we want you to do. We want you to sit and wait and hear everything before you make a decision, okay?

A. Okay.

Q. The reason I ask is because some people, you know, will hear, well, he committed that. If he did that, then that's it. It's over in my mind, okay.

A. Okay.

Q. That's enough for me to say, you know, that is the appropriate punishment. You're saying you're not there, right.

A. No, I'm not even close there.

Q. You're not there by a long shot?

A. Yeah, I'm not even there.

In response to continued questioning by the prosecutor, Cofield reiterated that he needed to hear "a lot of evidence" or an "enormous" amount of evidence in order to answer the future-dangerousness question in the affirmative, notwithstanding the fact that appellant had already been found guilty of murder in the course of committing or attempting to commit sexual assault. At the conclusion of his *voir dire* questioning, Cofield agreed that he could not affirmatively answer the future-dangerousness question based on the facts of the case alone.

Cofield also stated on *voir dire* that he worked as a detention officer for the Juvenile

Probation Department and that he greatly enjoyed inspiring juvenile offenders to change their lives for the better. He further stated that "[i]t's never too late" and that "[a]nybody can make a change."

When the trial court denied appellant's *Batson* challenge, defense counsel stated,

Again, I believe some of the jurors–and I can't point to them exactly right now–but I think other jurors also indicated the same thing, you know, people do change, people do get rehabilitated. Just by looking at their questionnaires I believe there's other jurors that are sitting on this panel that believe that, you know, rehabilitation and changing is something that can be done. So that's my response and that's why I don't think those reasons are sufficient, Your Honor.

Appellant now argues on appeal that "several juror sheets indicated the same beliefs" regarding the issue of rehabilitation; however, the jury questionnaires were not made a part of the record on appeal. In his appellate brief, he specifically mentions prospective jurors Victor Reveles, Richard Salcido, Veronica Collier, John Almanzar, and Jessica Portillo. Our review of their *voir dire* testimony does not support a finding of pretext.

The state's explanations for striking Cofield were facially race neutral, and appellant has not demonstrated evidence of pretext. Thus, the trial court did not abuse its discretion in denying appellant's *Batson* challenge to Cofield. Point of error four is overruled.

## CONFRONTATION CLAUSE

In point of error five, appellant asserts that the trial court erroneously admitted his high-school records, labeled state's Exhibit 237. Appellant claims that this exhibit, which contained an entry stating that he threatened and pushed another student, was admitted in violation of his Sixth Amendment right to confront the witnesses against him. However, there is no indication in the record that this exhibit was ever submitted to the jury.

The state offered the exhibit prior to the testimony of Nelson Negron and Clifton Gordon

McQueen, two school-resource officers who worked at appellant's high school. When the parties

discussed the admissibility of the exhibit at the bench, defense counsel objected.

> THE COURT: You need to direct my attention to the areas that you're objecting to. You can't make a blanket objection.
>
> . . .
>
> [DEFENSE COUNSEL]: Yes, Your Honor. There's reference to–Actually, it's the next one. I apologize. It's the next one after that. Talks about threatened a student and pushed, then he got out, a school suspension. I would argue to the Court that "that person threatened a student and pushed" is based on hearsay from another person and it's not something that was–you know, that qualifies under the business records exception.
>
> [PROSECUTOR]: The relevant portion of this, Your Honor, is that the Defendant in this case was, indeed suspended. The action of the school and the relevance of this document are to show his character and his background. When he was attending school he was suspended several times for different reasons and that's why we offered the documents in the first place. The result is what is the significant part.
>
> [DEFENSE COUNSEL]: I'm not arguing relevance, I'm arguing hearsay within hearsay. You know, I understand the business records come in under the -- you know, they filed their affidavit and everything and they filed them at the court. I'm arguing that that specific portion references hearsay within hearsay that is not admissible under the business record exception. Hearsay and confrontation to that particular portion that says "threatened a student and pushed."
>
> . . .
>
> THE COURT: I'm going to overrule the objection.

Negron and McQueen then testified about their encounters with appellant at his high school.

State's Exhibit 237 was not mentioned during their testimony. Negron did not testify regarding the

particular incident at issue. McQueen testified that he was present in 1999 when an "assistant

principal was going to suspend [appellant] for an assault," but he provided no further details

regarding that incident. Later, after both sides closed, the parties had a discussion regarding the

removal of exhibits that had not been identified or specifically discussed before the jury. The trial

court complied with the state's request to remove Exhibit 237 until it could verify whether or not it had been discussed. The record does not reflect that Exhibit 237 was mentioned again or that it was ever submitted to the jury for consideration.

Defense counsel objected only to the specific notation in the school records that appellant "threatened a student and pushed." McQueen did not testify to that effect. Since it appears that the exhibit was never submitted to the jury, and since McQueen testified only that he was present when assistant principal was going to suspend appellant for an assault, appellant has failed to demonstrate a Confrontation Clause violation. *See Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999) (finding no error when evidence at issue was never presented to the jury). Point of error five is overruled.

### ADMISSION OF PHOTOGRAPHS

In point of error six, appellant argues that the trial court violated Rules 401 and 403 by admitting the autopsy photographs labeled state's Exhibits 71, 106 through 110, and 256 through 262. He contends that these photographs were not relevant or necessary because he "had previously been found guilty as charged in the indictment . . . [that] listed all the different manners of causing [the] decedent's death[.]" He also contends that any probative value of the photographs was substantially outweighed by their prejudicial effect.

During the testimony of Dr. Corinne Elizabeth Stern, the medical examiner who performed Medina's autopsy, appellant made relevance and Rule 403 objections to the autopsy photographs that had been previously admitted at the guilt phase of his 2002 trial.[6] Before appellant made these

---

[6] We note that after both sides closed, the parties had a discussion regarding the removal of exhibits that had not been identified or specifically discussed before the jury. The state agreed to remove Exhibit 258 from the

(continued...)

objections, the parties had discussed the previously admitted evidence, and the trial court had determined that "any evidence previously received and considered by the jury in returning the guilty verdict is now received in evidence." Appellant complained that the state had "not laid a proper foundation" for the introduction of such evidence, and the state responded.

> This trial can take a long time for issues that have already been decided. The case law is clear. The Court–this Court, with all due respect, Your Honor, doesn't have any jurisdiction on anything but the punishment phase at this point. Those issues have already been decided and Defense counsel knows this. We've been through this. I don't have to lay a predicate. Everything that was admitted in the guilt portion is admitted now. There's no question. They're basic tenets of law.

The trial court then stated, "That's my ruling." Appellant further argued that this was a "totally different situation" in that this was a "brand-new" trial in front of a different jury. The trial court responded, "Your arguments are on the record. I've already made my ruling."

In its determination of the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); *see also Young,* 283 S.W.3d at 863. Appellant acknowledged that the evidence had been previously admitted at the guilt phase of his first trial. However, he argued that the state had to re-offer the evidence because the punishment hearing was being held before a different jury than the one that had previously convicted him. There is no requirement that evidence admitted at guilt phase must be re-offered before it can be considered at punishment. *Trevino v. State,* 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). The trial court did not abuse its discretion by admitting the photographs that had been previously admitted at the 2002 trial. *See Russeau v. State,* 291 S.W.3d 426, 432 (Tex. Crim. App.

---

[6](...continued)
jury's consideration. In addition, the record does not reflect that an exhibit labeled state's Exhibit 261 was offered or admitted at trial. We further note that appellant did not specifically object to state's Exhibit 71 until after Dr. Stern testified about it. *See* TEX. R. APP. P. 33.1.

2009) (when a case is on remand to the trial court for a new punishment hearing, the trial court's jurisdiction is statutorily limited to punishment issues). Point of error six is overruled.

**ADMISSION OF JOKES**

In point of error seven, appellant contends that the trial court erred in admitting an audio recording of the following jokes that appellant told his brother on the telephone while incarcerated.

VOICE NUMBER ONE: "Hey, you want to hear a joke?"

VOICE NUMBER TWO: "Yeah."

VOICE NUMBER ONE: "What do you tell a woman with two black eyes? Nothing, because you already told her twice."

VOICE NUMBER TWO: "All right."

(Laughter.)

VOICE NUMBER ONE: "You hear about that man who won the lottery?"

VOICE NUMBER TWO: "No."

VOICE NUMBER ONE: "Okay. He won the lottery, right. And he comes home and he tells his wife, 'Pack your stuff. I just won the lottery.'

"And she's like, 'What do I need to pack? Do I need to pack for the ski trip or do I need to pack for the"–(unintelligible.)

"Just pack your shit and get the hell out of here.'"

(Laughter.)

Appellant challenges the admission of this evidence on both constitutional and statutory grounds, arguing that the trial court violated his First Amendment right to freedom of speech and Rules 401 and 403 of the Texas Rules of Evidence. This point of error is multifarious because it is based on more than one legal theory; we will review appellant's arguments in the interest of justice. *See* TEX. R. APP. P. 38.1.

Appellant alleges that the admission of this evidence allowed the state to "criminalize [his] thoughts," in violation of the First Amendment. Although the First Amendment prevents the state from employing evidence of defendant's abstract beliefs at sentencing when those beliefs have no bearing on the issues being tried, such evidence may be admissible if it is shown to be relevant to the issues involved in the case. *Dawson,* 503 U.S. at 163-168. Future dangerousness is an issue that is relevant to the sentencing stage of a capital-murder trial. *Mason,* 905 S.W.2d at 577. Evidence of a defendant's character is one factor that a jury may consider when deciding the future-dangerousness special issue. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

When appellant made a freedom-of-speech objection to the admission of this evidence, the state responded that it was evidence of appellant's character, and the trial court overruled the objection. It is within the zone of reasonable disagreement that this evidence was indicative of appellant's character and thus relevant to the issue of future dangerousness. Defense counsel argues that appellant had been "trying to do the right things" since he was incarcerated, that he was sorry for what he did, that he took responsibility for his own actions, and that he understood what he did was wrong. The jokes at issue, which appellant told while incarcerated after raping, beating, and murdering a 15-year-old female, demonstrated the opposite. This evidence showed that appellant found the topics of violence and disrespect towards women to be humorous. The trial court did not abuse its discretion in admitting this evidence over appellant's First Amendment objection.

This evidence was also relevant under Rule 401 because it had a tendency to make the existence of any fact of consequence (*i.e.,* appellant's future dangerousness) more probable than it would be without the evidence. TEX. R. EVID. 401. Appellant claims that the evidence should nevertheless have been excluded under Rule 403 because its probative value was substantially

outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. Although the evidence was arguably prejudicial, it was not so prejudicial that there was a clear disparity between the degree of prejudice and its probative value. *Williams,* 958 S.W.2d at 196. And even if we assume that the evidence was admitted in violation of Rule 403, appellant was not harmed by its admission. *See* TEX. R. APP. P. 44.2(b). The state did not heavily rely on appellant's jokes, and it presented other, compelling evidence of appellant's future dangerousness, including the brutal facts of the offense and appellant's prior history, violent artwork, and conversion to Satanism while incarcerated. Point of error seven is overruled.

### JURY ARGUMENTS

In point of error eight, appellant asserts that the trial court erred when it allowed the state to argue to the jury that appellant was a con man because, even though he claimed to want to die, he spent four hours testifying before the jury. Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Cannady v. State,* 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). We have consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper. *Wilson v. State,* 7 S.W.3d 136, 147 (Tex. Crim. App. 1999); *Dinkins v. State,* 894 S.W.2d 330, 357 (Tex. Crim. App. 1995).

When appellant testified at trial, defense counsel questioned him regarding his journal that had been admitted into evidence and labeled State's Exhibit 291. In this journal, appellant wrote: "What Am I: A confidence man, a coward, a thespian. The virtue of my tribe is essentially deceit. In short, I am the consummate villian [sic] in a world without heroes." Appellant described this exhibit as simply a "concept journal" containing a fictitious "myth." In response to further

questioning by defense counsel, appellant said that he knew what he did to the victim was wrong and that he should give up his own life as a consequence of his actions.

> I mean, I'm a piece of crap. I understand that. I'm not asking–I didn't come here looking for salvation. I came here looking for an execution. I'm not asking you all to spare my life. I'm asking you all to allow me to give up my life in spite of hers, based on the laws that I live by. It's life for life. I took a life, mine should be taken in return. . . . I would tell [the victim's family] that sorry doesn't begin to explain and it doesn't begin to justify. . . . Nothing that I can do will ever justify the life that I took. It's not right and it will never be right. There's nothing that can make it right. Only thing I can say is that I'm asking them to allow me to give up my life. . . . Again, I didn't come here looking for salvation. I didn't come here to look to extend my life. I came here looking for an executioner.

Defense counsel later argued at closing that appellant "deserves to live because he gets it," *i.e.,* he understood what he did was wrong and he took responsibility for his own actions without making excuses for himself. Defense counsel also argued that appellant showed "the ultimate remorse" by asking the jury "to put him to death because of what he did." The prosecutor responded without objection from appellant.

> You know what? He doesn't get anything. He doesn't get it at all. And I'll show you why in this evidence. There's proof that he doesn't get it, not at all, because the bottom line is that [appellant] is a con man. One of the best–and you saw it yesterday, almost four hours, and we'll talk about that. And you know what, Ladies and Gentlemen, you don't even have to take my word for it. There's evidence right there in his own words that he's a con man. . . . In his own writing he says, "What am I? A confidence man, a coward, a thespian. The virtue of my tribe is essentially deceit. In short, I am the consummate villain in a world without heroes."

When the prosecutor continued to refer to appellant as a "con man," defense counsel objected.

> [PROSECUTOR]: And Ladies and Gentlemen of the Jury, he's a con man. And here's his bet. If you buy his con, at the very end of all his testimony, if you buy that con when he says execute me, his bet is that you're going to feel sorry for him and you're going to give him life. He's put it all in because he doesn't have anything else to lose.

If that were true, if his story that he told you was true, I'm sorry, I didn't mean to do it, give me the death penalty, why did he take almost four hours to explain and justify every single thing he did? All his writings, his journal, making up stories that this is about some fictional character–

[DEFENSE COUNSEL]: I'm going to object. That's striking at the Defendant over the shoulders of Counsel. I'm the one that chose to do that direct examination. They're attacking my client for that.

[PROSECUTOR]: His explanations for all of these pictures, commissioned art and all that. He's a con man. And he's telling you all this. Why did he spend four hours doing that? I'm sorry–

[DEFENSE COUNSEL]: I'm going to make the same objection. I'm the one who chose to do that. They're attacking him over what I did.

THE COURT: Overruled.

[PROSECUTOR]: I'm talking about everything that this guy said on the stand, right? Could he have said it in just a couple of minutes? Sorry. Please give me the death penalty. The end. But instead he spends almost four hours–

[DEFENSE COUNSEL]: Renew the same objection, Your Honor.

THE COURT: Overruled.

Appellant contends that when the prosecutor accused Appellant of being a con man because of the length of time he was on the stand, she was striking at appellant over the shoulders of defense counsel because the attack was really a criticism of counsel's decision to have Appellant testify for that length of time. This is an inaccurate characterization of the prosecutor's argument, which was directed not at defense counsel, but at appellant himself. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (holding that "a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character"). Defense counsel failed to object the first time the prosecutor argued that appellant was a con man who spent four hours on the stand. *See*

TEX. R. APP. P. 33.1 (requiring a timely objection in order to preserve error); *see also Lane v. State,* 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (stating that error in the admission of evidence is cured where the same evidence comes in elsewhere without objection). Even if we reach the merits of this allegation, appellant's claim fails because the prosecutor's argument was a reasonable deduction from the evidence and an answer to the argument of opposing counsel. *Cannady,* 11 S.W.3d at 213. Point of error eight is overruled.

In points of error 9A and 9B, appellant contends that the trial court improperly prevented him from making his desired closing arguments to the jury. In point of error 9A, appellant claims that he should have been able to argue "that the jury could consider as mitigating [his] claim that his initial [sexual] encounter with the victim was consensual." In point of error 9B, he claims that he should have been able to argue that the jury was required to find that he was beyond redemption before it could answer the mitigation special issue in the negative.

At issue is the following exchange during closing argument.

[DEFENSE COUNSEL]: When you have to answer the other question, the second question, what does it ask you to do? It asks you to take all the evidence into consideration, his character, his background, his moral culpability. What does that boil down to, Ladies and Gentlemen? You have to decide that this person is so far beyond redemption that there is no reason–

[PROSECUTOR]: Objection, Your Honor. That is an improper statement of the law.

[DEFENSE COUNSEL]: It is not, Your Honor. That is what they have to decide to do, in the opinion of the Defense.

THE COURT: The question that they need to address, the issue, is in the Court's charge, and that's what they will be addressing, not this other one. So I'll sustain the objection, ask you to move on.

. . .

[DEFENSE COUNSEL]: All right. Is there a mitigating circumstance in this case, Ladies and Gentlemen? I'm going to outline what I think are two different mitigating circumstances in this offense. I'm going to ask you to take into consideration that if you think that this started out as a consensual relationship, you should use that as a mitigating circumstance.

[PROSECUTOR]: Objection, Your Honor.

[DEFENSE COUNSEL]: In this–

THE COURT: I'm going to sustain the objection. The Defendant has been found guilty.

[DEFENSE COUNSEL]: Your Honor–

THE COURT: This Jury will not revisit whether it was consensual as you're asking them to. He has been convicted.

[DEFENSE COUNSEL]: No, I–

THE COURT: [Defense counsel], I will ask you not to argue with the Court.

[DEFENSE COUNSEL]: Your Honor, with all due respect, I am not arguing that this was–that they didn't find him guilty of it. I'm saying that if this started out as a consensual relationship, and there's a lot of evidence to prove that and show that, I'm not saying that it ended that way. I'm saying it began– and if it began that way, I think that's a mitigating circumstance they can take into effect. I ask you to let me argue that.

[PROSECUTOR]: Your Honor, this Jury–

THE COURT: The Defendant has been found guilty, [defense counsel].

[DEFENSE COUNSEL]: I'm not arguing that. I'm doing a very–

THE COURT: They can look at all of the circumstances surrounding the incident in deciding whether or not there's sufficient mitigation. Go ahead.

[DEFENSE COUNSEL]: Thank you. Ladies and Gentlemen, there is a lot of evidence out there to show you that this started out as a consensual relationship.

[PROSECUTOR]: Objection, Your Honor.

[DEFENSE COUNSEL]: It didn't end–

[PROSECUTOR]: Your Honor, I'm going to object. He cannot tell this Jury what mitigation is. Only the Jury can decide, based on the evidence, whether or not something is mitigating, and then they have to balance it.

[DEFENSE COUNSEL]: As a Defense attorney I can't say as far as the Defense is concerned this is mitigating and you should take it into consideration?

THE COURT: You may argue the evidence.

[DEFENSE COUNSEL]: Okay. I'm arguing the evidence, Your Honor.

Appellant asserts that the improper denial of his jury arguments amounted to a denial of his right to counsel and prevented him from presenting a defense. When appellant testified before the jury, he explained that he and Medina began having consensual sex, but he "snapped" when she changed her mind and threatened to accuse him of rape if he told anyone about their sexual encounter. Detective Albert Licon confirmed that appellant had told the same story when questioned by the police. Defense counsel elicited testimony from Dr. Stern on cross-examination that she could "[n]ot with a hundred percent certainty" determine whether or not the sex was consensual. And although the trial court initially sustained the state's objections to appellant's consensual sex as a mitigating circumstance argument, the record reflects that the trial court later overruled the state's objection to a similar argument.

> [DEFENSE COUNSEL]: Detective Licon. What did he say to you? This is not something that we suddenly made up to tell you. He told you that before he took Irving's confession, that Irving told you this started out as a consensual relationship. This confession came into evidence and it was uncontroverted. The prosecution had the opportunity when he was on the stand to confront him about the truthfulness of this confession and they didn't, Ladies and Gentlemen. It came in uncontroverted and there is no reason for you not to believe it. "We were near the portable buildings and it was dark. We began to have sex. She was a willing participant." If you think that this started out as a consensual relationship because of the evidence that was presented to you, then you could use that as a mitigating factor.
>
> [PROSECUTOR]: Objection, Your Honor.

THE COURT: Overruled.

Thus, appellant was ultimately allowed to make his desired argument to the jury. Point of error 9A is overruled.

We further hold that the trial court did not abuse its discretion in sustaining the state's objection to appellant's argument that the jury was required to find that he was beyond redemption before it could answer the mitigation special issue in the negative. This is not what Article 37.071 requires. The statute instead requires that the jury answer a specific question.

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Art. 37.071, § 2(e)(1). Although we have held that improper denial of a jury argument may constitute a denial of the right to counsel, this holding assumes that the jury argument is one the defendant is entitled to make. *McGee v. State,* 774 S.W.2d 229, 239 (Tex. Crim. App. 1989). Appellant was not entitled to argue contrary to Article 37.071. Point of error 9B is overruled.

We affirm the judgment of the trial court.

Delivered: September 29, 2010
Publish