

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-76,571
---

**ARELI ESCOBAR, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL FROM CAUSE NO. D1DC 09-301250
### IN THE 167TH DISTRICT COURT
### TRAVIS COUNTY
---

ALCALA, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, PRICE, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined. WOMACK, J., did not participate.

### O P I N I O N

In this direct appeal, Areli Escobar, appellant, challenges the trial court's judgment sentencing him to death for the capital murder of Bianca Maldonado Hernandez, the complainant, for intentionally causing her death in the course of committing or attempting to commit aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). In eighteen points of error, appellant contends that the evidence is insufficient to establish his guilt and

that the trial court erred by denying his pretrial motion to suppress; denying certain questions during voir dire; permitting certain scientific evidence in the guilt/innocence phase of trial; and admitting certain evidence in the punishment phase. We conclude that his arguments are without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## I. Background

Appellant and Bianca both lived in the same apartment complex on Decker Lane in Austin, Texas. Their apartment units were separated by a driveway and a distance of approximately one hundred yards. Appellant shared his apartment with his sisters Nancy and Lydia and his sisters' children. Likewise, Bianca, who was 17 years of age at the time of her death, shared her apartment with her family: her infant son, Cesar; her mother, Jacqueline; and her sister, Dania. The close proximity of appellant to Bianca proved to be fatal to her in the early morning hours on May 31, 2009.

### A. The Sexual Assault and Death of Bianca

That morning, Bianca and Cesar were left alone at around three in the morning, when Jacqueline locked the door to the apartment, as was her custom, and left with Dania for their job delivering newspapers. When they left, Bianca was awake and nursing Cesar. Less than four hours later, Jacqueline and Dania returned to the apartment.

After unlocking the door, Dania entered the apartment with Jacqueline, who immediately noticed that the living room was in disarray. The furniture cushions were scattered around the room and they, the walls, and most of the carpet were covered in blood.

Jacqueline then saw Bianca laying face down in the living room. Bianca felt "cold" when Jacqueline touched her back. Next to Bianca was Cesar, who was alive but covered in blood and motionless. Jacqueline picked up Cesar, handed him to Dania, and called 9-1-1.

Emergency Medical Services paramedics Eric Chandler and Eric Lancaster were the first responders to arrive at the apartment. Dania was standing outside the apartment with Cesar when they arrived. Cesar's injuries were assessed in the ambulance. Inside the apartment, Chandler confirmed that Bianca did not register a pulse and that her body was cold and stiff.

Austin Police Department Homicide Detective David Fugitt arrived at the apartment at approximately 8:20 a.m. Fugitt found Bianca face down on her stomach with her head tilted toward her shoulder. She was covered in blood, and her hair was completely matted with blood. She was nude with the exception of her blood-soaked bra that was fastened in the back but had been adjusted to expose her breasts. Fugitt could see a number of injuries on her body. She appeared to have been beaten and had numerous and significant defensive injuries on her hands and arms that appeared to have been caused by a knife or sharp object. She had been stabbed in the face several times, and it appeared that a portion of her scalp had been filleted. Bianca's legs were spread apart, the skin extending up the crease of her buttocks to her lower back was split, and there appeared to be a hand print on her buttocks. When Bianca's body was turned over in preparation for transport, emergency personnel could

see bruising to her eyes, nose, and lip, as well as additional stab wounds to her face, head, left breast, and right shoulder.

## B. The Actions of Appellant

Shortly before Bianca was left alone with her son in her apartment, appellant was at his apartment with his then-girlfriend Zoe Moreno,[1] whom he had earlier asked to spend the night with him. When she arrived at the apartment around 2:15 a.m., Moreno spoke with appellant, appellant's sister Nancy, and Nancy's boyfriend Miguel Depaz-Aguirre ("Tano"), and then took a shower. Moreno recalled that appellant was dressed in jeans, a short-sleeved shirt, and black, zippered Polo shoes. At that time, he did not appear to be injured. He had no visible cuts, scratches, or abrasions on his face or body.

At approximately the same time that Jacqueline and Dania were leaving for their paper route, appellant's sister Lydia left appellant's apartment to drive a friend home. Appellant left the apartment with Lydia and her friend, and then he remained outside as Lydia and her friend left the apartment complex. After she finished taking her shower, Moreno realized that appellant was not going to return to the apartment. She became angry, packed her overnight bag, got into her car, and drove home. When she left the apartment complex, she noted that appellant's Lincoln Navigator was still parked in the complex's parking lot.

---

[1]     Between the time of the offense and the time of trial, Zoe Lopez married and took the name Zoe Moreno. Therefore, she is referred to with both names in the record. She is referred to throughout this opinion by her married name, Moreno.

As she drove home, Moreno attempted to call appellant's cell phone several times. The first three calls were not answered, but at approximately 4:12 a.m. a call went through, and the line remained open for about ten minutes. For the first four minutes of the call, Moreno could hear a female "screaming and screaming and screaming, nonstop screaming." She subsequently heard "moans [and] grunts [with] screaming in between." When she heard the moaning and the grunting, she immediately thought that appellant was having sex with someone. Phone records indicated that the phone call from Moreno's cell phone to appellant's cell phone "hit" a cellular tower close to the apartment complex where the murder took place. At about 5:11 a.m., Moreno sent a text message to Nancy, telling her that she had called appellant and heard him having sex with another woman.

At around the same time, between 5:00 a.m. and 5:30 a.m., appellant arrived at his mother's apartment to change his clothes. He was injured, wore bloody clothing, and complained about having been in a fight. Appellant gave the bloody clothes to his mother to wash and found something else to wear. Appellant's mother washed the clothes twice, but was unable to get the blood out.

At 5:26 a.m., Moreno received a text message from Nancy's phone stating that appellant had gone to his mother's apartment to change clothes because he had been in a fight and had a bloody shirt, and he could not go home because someone might be looking for him. Upon learning this information, Moreno quickly sent a text message at 5:45 a.m. to her adult son Emilio Lopez, stating "OMG I think [appellant] raped someone."

Appellant had driven Nancy's rental car, a tan four-door Mazda Protegé, to his mother's apartment and, a couple of hours after visiting her, drove it to Tano's apartment. Appellant called Tano at around 7 a.m. and said that he was on his way to see him. Appellant initially told Tano that he "fucked up some woman," but then he changed his story and said that he had a fight with "some asshole." Before appellant arrived at Tano's apartment, Tano sent a text message to Nancy telling her that appellant had told him that he had "f-ed up" and that some girl's blood was on his clothes. Nancy later shared this information with Moreno through a text message. After he had spent several hours with appellant, Tano drove appellant back to his apartment, leaving appellant there sometime after 4:00 p.m.

Later that night, appellant claimed that he had sex with a girl early that morning. Through text messages, appellant's sister Rosalva asked him if he had hurt a girl, and appellant denied that he had done that. He replied that he had "just tapped that," which Rosalva understood to mean that he had sex with a girl.

### C. The Physical Evidence and Autopsy

Investigators recovered several items of physical evidence in Bianca's apartment. They found the shorts that Bianca was last seen wearing, still fastened, on the sofa. Her panties were found under the shorts. A bloodstained bottle of lotion was found near the love seat. A footprint impression was found in the carpet next to Bianca's body.

Blood was present on the interior and exterior surfaces of the front door, but there was no indication of forced entry into the apartment. Strands of hair, matted with blood, were

found in the front entryway. Investigators determined that Bianca's struggle began at the front door and continued into the living room, where she ultimately died. The dining room, as well as the three bedrooms, appeared undisturbed. Investigators discovered blood transfer on the threshold of the hallway bathroom. There was blood around the bathroom sink, and water from the faucet was running into a purse found in the sink.

Travis County Medical Examiner Dr. David Dolinak performed the autopsy on Bianca's body on June 1, 2009. Lividity was present on the front of her body, which indicated that she had died face down. Her face showed evidence of blunt-force injury consistent with having been punched or kicked. She also suffered a blunt-force injury to her scalp. Bianca had been stabbed forty-three times and cut thirty times by two different sharp objects, possibly a single-edge knife at least three inches long and a separate object with a serrated edge. The injured tissue associated with the stab wounds and cuts was bloody, indicating that Bianca was alive when she sustained the injuries. Bianca also sustained stab wounds to her forehead, cheek, lips, left side of her nose, scalp, breasts, and shoulder. She suffered stab wounds in her left upper chest that resulted in broken ribs and a punctured lung. Another stab wound penetrated the right side of her heart. The injuries she sustained to her arms and hands were consistent with defensive wounds and with grabbing the knife blade three or four times while attempting to fend off her attacker.

An area of skin from the top crease of Bianca's buttocks to her lower back was torn away. This injury appeared to be consistent with the buttocks being spread apart with enough

force to tear the tissue. Bianca also suffered "devastating" injuries to her vagina, internal sexual organs, and anus. According to Dolinak, a large, hard object, not consistent with a male sexual organ, had been pushed into Bianca's vagina with enough force to stretch the tissue until it gave way. Likewise, some type of large, hard object had been inserted into Bianca's anus, causing it to tear. The result of this trauma caused Bianca's vagina and anus to transform into a single orifice with only a thin rim of skeletal tissue remaining between the anus and the vagina. Bianca's internal injuries, including those to her bladder, lower pelvic region, rectum, and reproductive organs, showed evidence of hemorrhaging, which indicated that Bianca was alive when she suffered the injuries. According to Dolinak, Bianca's death occurred as a result of cumulative blood loss caused by all of the stab wounds, and likely occurred within five to ten minutes of her suffering her final injury.

### D. The Trial

After it was selected, the jury found appellant guilty of capital murder and answered the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e). TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1), (e)(1). Based on those answers, the trial judge sentenced appellant to death. *Id*. at § 2(g). Direct appeal to this Court is automatic. *Id*. at § 2(h).

## II. Sufficiency of Evidence

In point of error two, appellant argues that the State's evidence was legally insufficient to support his conviction for capital murder. When reviewing the sufficiency of the evidence, we assess all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences that may be drawn therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

To prove the essential elements of capital murder in this case, the State had to show that appellant intentionally committed the murder of Bianca in the course of committing or attempting to commit aggravated sexual assault. TEX. PENAL CODE ANN. §§ 19.03(a)(2); 22.021. Specifically, appellant argues that no rational juror could have found beyond a reasonable doubt that the injuries to the victim's vagina and anus were inflicted prior to her death or that appellant intended to commit or attempt to commit sexual assault before the victim's death.

Appellant's argument centers on the testimony of the medical examiner, Dolinak. He contends that, because Dolinak agreed with defense counsel on cross-examination that "[t]here could be some oozing" of blood from the sexual assault injuries even after Bianca died and that there could be tissue discoloration even if those injuries occurred post-mortem, both of which could indicate that the sexual assault took place after Bianca's death, the evidence did not rise to a level sufficient to meet the State's burden of proof. Appellant

further cites Dolinak's acceptance on cross-examination that the nature of the physical evidence could support defense counsel's theory that the killing occurred in "a rage" to argue that the State failed to prove appellant's specific intent to commit sexual assault prior to Bianca's death. Appellant also questions Dolinak's conclusion that the sexual assault injuries were inflicted before Bianca died because Dolinak did not preserve tissue for testing and he did not state his opinion "to a medical certainty."

Appellant's argument takes Dolinak's testimony out of context and ignores testimony from other witnesses. Dolinak testified that he did not preserve tissue for testing because it was clear to him that Bianca was alive when she was sexually assaulted. Dolinak also testified that tissue testing is only one method of determining whether a victim was alive when a sexual assault occurred. Dolinak was able to make his determination through the alternative method of examination of the physical injuries.

Dolinak testified that there were three tears to Bianca's vagina as shown in a photograph labeled State's Exhibit 432. He testified that the tears and the accompanying blood indicate that Bianca was alive when the injuries were inflicted. He also discussed a photograph labeled State's Exhibit 436, which showed only a thin strand of tissue remaining between Bianca's vagina and anus. According to Dolinak, the red areas shown in the photograph indicated bleeding and signified that Bianca was alive at the time she suffered the injuries. Additionally, Dolinak found hemorrhaging at the sites of injuries to Bianca's internal sexual organs, bladder, rectum, and the area near her pelvic bone. Dolinak testified

that the presence of bleeding and hemorrhaging supported his conclusion that Bianca was alive when she was sexually assaulted. Dolinak definitively concluded that there was no question that Bianca was alive when she was sexually assaulted.

The jury heard other testimony suggesting that the sexual assault occurred before Bianca's death. When appellant's sister asked him if he had hurt a girl on the morning of Bianca's death, he replied that he "just tapped that." Additionally, when she called appellant's phone, Moreno heard screaming taking place concurrently with other sounds that she associated with sexual activity. Dolinak's testimony regarding the presence of bleeding and hemorrhaging, coupled with Moreno's testimony of overhearing screaming and sounds of sexual activity and appellant's admission to his sister that he had "tapped" a girl, support a conclusion that the sexual assault occurred before Bianca's death.

The evidence viewed in the light most favorable to the verdict was sufficient for the jury to rationally conclude that appellant intentionally murdered Bianca in the course of committing or attempting to commit aggravated sexual assault. *See Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003) (holding that conviction of capital murder committed in the course of aggravated sexual assault "is supported by the evidence, [and] thus, the evidence is legally sufficient to support the verdict").

We overrule point of error two.

### III. Challenge to Validity of Search Warrants

In point of error one, appellant alleges that the trial court erroneously failed to suppress the physical evidence that was seized pursuant to six different search warrants, which were issued by four different magistrates.[2] Appellant specifically complains that the affidavits for these warrants did not establish probable cause because they relied on the "hearsay-upon-hearsay" statements of Zoe Moreno.

This Court normally reviews a trial court's ruling on a motion to suppress by using a bifurcated standard of review that (1) gives almost total deference to the historical facts found by the trial court and (2) reviews *de novo* the trial court's application of the law to those facts. *See State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). "However, when the trial court is determining probable cause to support the issuance of a search warrant, there are no credibility determinations[;] rather[,] the trial court is constrained to the four corners of the affidavit." *Id*. Accordingly, when we review the magistrate's decision to issue a warrant, we "apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant" rather than without one. *Id*. As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold his probable-cause determination. *Id*. The reviewing court should interpret the affidavit in a "commonsensical and realistic manner," recognizing that the magistrate may draw reasonable inferences. *Id*. When in doubt, we defer to all reasonable inferences that the magistrate could have made. *Id*.

---

[2]     Appellant also lists his arrest warrant as a complained-of warrant, but he does not make any specific argument regarding that warrant. Therefore, we will not discuss it further.

Probable cause for a search warrant exists when, under the totality of the circumstances, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at the specified location. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). It is a flexible and non-demanding standard. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007). This Court has previously established that "[h]earsay-upon-hearsay may be utilized to show probable cause as long as the underlying circumstances indicate that there is a substantial basis for crediting the hearsay at each level." *Hennessy v. State*, 660 S.W.2d 87, 91 (Tex. Crim. App. 1983). A magistrate has a substantial basis for finding probable cause based on the "totality of the circumstances" presented in the affidavit. *Id*. at 92. The credibility and reliability of an informant can be established by being named and by giving detailed information about activities that were substantially corroborated through independent police investigation. *Id*. at 91.

Four of the search warrants, which issued on June 2, 2009, authorized the searches of appellant's and his mother's homes and the seizure of buccal and penile swabs, an epithelial sample, scrapings and clippings from appellant's fingernails, and samples of appellant's head and pubic hair. A fifth search warrant, which issued on June 4, 2009, authorized the search of a tan Mazda Protegé. The sixth search warrant, which issued on June 22, 2009, authorized the seizure of appellant's cellular telephone.

Appellant complains that the following information repeated within each of the search-warrant affidavits contained inadmissible instances of hearsay-upon-hearsay:

During the course of the investigation, a tip was received through Crime Stoppers from [Moreno]. [Moreno] was located and interviewed by Austin Police Detective K. Scanlon. [Moreno] stated that on the early morning of May 31, 2009, [Moreno] was asked by her boyfriend, [appellant] to spend the night at his apartment, which was located . . . in Austin, Travis County. [Appellant's apartment] and [Bianca's apartment] were located along the north side of the complex, and are separated by the driveway running through the complex. [Moreno] arrived at the apartment around 2:30 a.m. After arriving, [Moreno] took a shower, visited with the residents, and went to bed. After [Moreno] went to bed, she heard the door shut. [Moreno] got up and realized that [appellant] had left the apartment. [Moreno] stated that she was angry that [appellant] left the apartment, so she decided to return to her own residence. [Moreno] stated that when she left the apartment, she noticed that [appellant's] vehicle, a Lincoln Navigator, was still in the parking lot, leading her to believe that he left the apartment on foot. [Moreno] stated that she started to call [appellant's] cell phone at 4:04 a.m. [Moreno] stated that [appellant] did not answer the first three times she called. Det. Scanlon reviewed [Moreno's] phone and discovered that the calls were placed at 4:04 a.m., 4:04 a.m., and 4:12 a.m. On the forth [sic] call to [appellant's] cell phone, which was at 4:15 a.m., the line connected and she heard a female screaming. The call remained connected for 10 minutes and 24 seconds. [Moreno] heard panting and moaning while she listened to the open line. The call times were confirmed by Det. Scanlon through a review of the recorded data on [Moreno's] phone.

The phone data was reviewed by Computer Forensics Detective Charles Riely. The following data was recovered from the cell phone belonging to [Moreno]. At 5:11 a.m., [Moreno] sent a text message through her cell phone to [appellant's] sister Nancy Escobar stating that she had called [appellant] and heard him having sexual intercourse with another woman. A text message was then sent to [Moreno's] cell phone from Nancy Escobar's phone, at 5:26 a.m., stating that [appellant] had come over to his mother's house to change clothes because he had fought and had a bloody shirt[;] she also stated that he could not come home because someone might be looking for him. Through

computer research done by officers of the Austin Police Department Intel Unit, it was later learned that [appellant's] mother, Rose[3] Escobar lives at . . . .

At 5:45 a.m., [Moreno] sent a message to her son Emilio Lopez stating, "OMG I think [appellant] raped someone."

Another text message was sent to Nancy Escobar from [Moreno] at 12:06 [p.m.], asking Nancy if she found out what happened. During Nancy's responses she stated that she spoke with "Tano" and [appellant] told him that he "F-ed up[.] The blood was sum [sic] girls and not his. My mom already washed his clothes 2x and she still can't get all the blood off. She said his clothes had tons of blood on it. Gosh idk what he did." [Moreno] stated that "Tano" is the boyfriend of Nancy.

In her statement to Det. Scanlon, [Moreno] stated that when she last saw [appellant] prior to his leaving the apartment, he was wearing a blue checkered short sleeved shirt, blue jeans and black leather polo type shoes with the zipper on the front.

Within its four corners, the affidavit shows that Moreno personally observed the time at which appellant left his apartment, the clothing he was wearing, and that his vehicle remained in the parking lot after he left. Furthermore, Moreno personally called appellant's cell phone and, when the line connected, she heard the screaming and sounds of sexual activity. Detective Scanlon corroborated the information regarding the various phone calls Moreno made to appellant's phone when he reviewed Moreno's cell phone data. Scanlon also corroborated Moreno's claims regarding the text conversations that she had with appellant's sister by reviewing the cell phone data, thus providing further indicia of reliability. Based on Moreno's personal accounts described in the search-warrant affidavits,

---

3    Appellant's mother is identified as "Rose" in the probable-cause affidavits, but her name is actually "Valeria" Escobar. Rosalva "Rose" Escobar is the name of one of appellant's sisters.

there was probable cause that appellant sexually assaulted and injured a person who likely lived near him because he did not drive his vehicle when he left his apartment, and that the clothes he was last seen wearing by Moreno would probably contain evidence of that offense because the screaming overheard by Moreno signified a violent attack. This alone would support the magistrate's conclusion that there was probably evidence of the sexual assault that could be obtained from appellant's home and from appellant's person, including the seized evidence police ultimately obtained from buccal and penile swabs, an epithelial sample, scrapings and clippings from his fingernails, and samples of his head and pubic hair.

The information supporting the search of appellant's mother's apartment and appellant's sister's tan Mazda Protegé, however, became known to Moreno not through her personal contact with appellant, but instead because of information conveyed to Moreno by others. This type of hearsay-within-hearsay is permitted to establish probable cause "as long as the underlying circumstances indicate that there is a substantial basis for crediting the hearsay at each level." *Hennessy*, 660 S.W.2d at 91. The statements attributed to Nancy Escobar, her boyfriend Tano, and appellant's mother were sufficiently detailed so as to suggest direct knowledge on their parts. *See Wilkerson v. State*, 726 S.W.2d 542, 545 (Tex. Crim. App. 1986) (holding that "[w]hen the affidavit contains information given by a named informant . . . the affidavit is sufficient if the information given is sufficiently detailed so as to suggest direct knowledge on his or her part"). The individuals to whom the statements were attributed were named, not anonymous, sources. *See id.* The tenor and content of the

text messages attributed to Nancy suggest that she, Moreno, and appellant had a close relationship. *See id.* (noting that named informants were "entitled to some credibility given [their] relationship[s] to appellant"). There is no indication that Nancy was providing Moreno with false information about the conversation she had with Tano or her mother's complaint about washing appellant's bloody clothes. The trial court, therefore, did not err in considering the hearsay-upon-hearsay within the affidavits in determining that probable cause existed to issue the search warrants. *See id.*

Appellant also argues that the affidavits failed to establish probable cause because they did not allege any proof that connected him to the crime. The affidavits, however, contained the following information that connected appellant to the crime:

- Appellant lived in the same apartment complex as Bianca Hernandez. His apartment was located across a driveway, approximately one hundred yards from where the offense took place.

- Appellant left his apartment at approximately the same time on the morning of the offense as Bianca's mother and sister left their apartment for their paper route.

- The time of the offense corresponds with the time at which appellant left his apartment and the period during which his whereabouts were unaccounted for.

- The time of the connected phone call made by Moreno to appellant's cell phone corresponds to the time of the offense. During that phone call, Moreno heard moaning and other sounds consistent with sexual activity; she also heard a female screaming for ten minutes during that call.

- The amount of blood at the crime scene suggested that whoever committed the offense would have been covered with a lot of blood.

- Appellant went to his mother's home in his sister's car to have his clothing washed, arriving sometime prior to 5:26 a.m. He was wearing clothing that "had tons of blood on it."

- Although it was early in the morning, appellant's mother repeatedly attempted to wash the blood out of his clothes.

- When appellant was arrested on June 2, 2009, he had injuries to his face, right hand, and elbow, which were consistent with having been involved in a struggle the day of the offense.

- Appellant's admission to his sister's boyfriend that he "F-ed up" and that the "[t]he blood was sum [sic] girl[']s and not his" is consistent with the state of the crime scene and Bianca's body.

The magistrates were entitled to draw reasonable inferences from these facts. Based on the totality of the circumstances presented in the affidavits, the magistrates had a substantial basis for finding that probable cause existed to issue the search warrants. *See Rodriguez*, 232 S.W.3d at 60. Point of error one is overruled.

## IV. Jury Selection

Appellant's third through seventh points of error challenge rulings made by the trial court during jury selection. Appellant asserts that the trial court improperly (A) granted the State's challenges for cause, (B) disallowed appellant's trial counsels' proper questions, and (C) denied appellant's challenges for cause. As explained more fully below, we conclude that these challenges are without merit.

### A. Trial Court Properly Granted State's Challenges for Cause

In point of error three, appellant complains that the trial court erroneously granted the State's challenges for cause against four venire members in violation of the Supreme Court's rulings in *Wainwright v. Witt* and *Adams v. Texas. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985); *Adams*, 448 U.S. 38, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980). A prospective juror who can set aside his beliefs against capital punishment and honestly answer the special issues is not challengeable for cause. *See Witherspoon v. Illinois*, 391 U.S. 510, 522–23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1980). However, under *Witherspoon* and its progeny, a trial court may grant a State's challenge for cause on the basis of a prospective juror's conscientious scruples about the death penalty if the prospective juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 433; *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

We review a trial court's ruling on such a matter with "considerable deference" because the trial court is in the best position to evaluate a prospective juror's demeanor and responses. *Smith*, 297 S.W.3d at 268. When a prospective juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id*. We will reverse a trial court's ruling only if the record shows a clear abuse of discretion. *Id*.

**1. Trial Court Granted Challenge for Cause on Nellis**

Appellant complains that the trial court erroneously granted the State's challenge for cause against prospective juror Nellis. Appellant argues that Nellis "did not indicate

unequivocally that he could not follow the law, only that he was 'afraid' he would not be fair." Appellant also argues that the trial court abused its discretion by applying an incorrect legal standard, in particular, "whether the possibility of having to impose a death sentence would violate a prospective juror's conscience."

Regarding Nellis's ability to answer the special issues, when questioned by the State as to whether he felt he could participate in a process where the death penalty was a possibility, Nellis responded, "I don't feel that is something that I could do."  The State continued its questioning about participation in the punishment phase, asking Nellis the following:

Q.     I know when we talked on Wednesday, one of the questions – one of the issues that we talked about is that an important job of a juror is to make judgments about other people, to judge whether someone is guilty or not guilty and to make judgments about – in a death penalty case, about future dangerousness and mitigation, and I know you raised your hand and said that for personal reasons that you were not able to sit in judgment?

A.     In a case like this, I feel that way.  I don't feel comfortable with my decisions affecting someone else's life.

Q.     Okay.  And so do you still have that same answer, that you could not sit in judgment as a juror in a case like this?

A.     Yes.

Defense counsel then attempted to elicit a firmer answer from Nellis in the following exchange:

Q.    So generally, you are not opposed to capital punishment. You certainly can see cases where it would be appropriate. That is what you have written here in your statement under oath, right?

A.    Yes.

Q.    And realizing that it would be uncomfortable for you to sit on a jury, can you – if it were a case that you were on the jury, could you perform your duties as a juror?

A.    I don't know. I would hope I could.

Q.    Unfortunately, we are in that position of having to make you say whether you would or wouldn't, and if you were sworn in and made a juror in this jury, you took that oath that you would a true verdict render according to the law and evidence, would you do what the evidence led you to? Would you do what you were supposed to do as a juror?

A.    I would try, yeah.

The State then attempted to clarify whether Nellis would be able to take the oath and perform the duties of a juror:

Q.    Do you remember at this point the only oath that you have taken is to swear to tell the truth, and a person who is a juror has to take an oath that they will render a true verdict according to the law and the evidence, and some people can take that oath and some people cannot, and taking the juror oath, by taking the juror oath, you are swearing that you will make a decision based on the evidence, and another way of [looking at] that is that you would be judging the evidence, and you would be judging another person, this defendant, [appellant], and so what I need to know[,] is that something that you are able to do or is that something – in this type of case, or is that something you are not able to do?

A.    I am not sure if I would be able to do that.

Q.    Okay. And I appreciate your thoughtful answers, and – I am not trying to – I do have to bug you a little bit, which is for legal reasons. We

need to ask you to think about it and if you can to give us a yes or a no, that you could do it or you could not do it, and I think what you have told us is that you are not sure you would be able to do it. Do you feel like you could do that or do you feel like you could not?

A. Do I feel like I could take the oath?

Q. Take the oath to judge the evidence and make a decision, whether life – whether it leads to life in prison or whether it leads to the death penalty?

A. No.

Q. You feel like you could not?

The record shows that Nellis shook his head negatively, and the trial court asked for a clarification of whether that was a no. Nellis stated, "Correct," and the trial court attempted further clarification by asking, "You cannot?" Nellis responded, "I guess if it is the law, yes, I have to."

The trial court, in the face of Nellis's contradictory answers, attempted to clarify by once again asking Nellis if he could take the oath. Nellis replied, "In this case, no, I don't think in this particular case, no." The trial court explained the following to Nellis:

[Court]:     It is not comfortable, it is a duty, and if [you] can do it – some people can't do that, and we understand and appreciate that under our law, but nobody is comfortable doing these things. It is an uncomfortable and very difficult task. The question is whether when you say uncomfortable you mean it would violate your conscience or go against all of your beliefs, or it is just uncomfortable, you know. We don't know what that means when you say uncomfortable, because everybody is going to be uncomfortable in a difficult situation.

In response to the trial court's explanation, Nellis replied, "No, I could not."

Appellant contends that the exchange indicated that the trial court abused its discretion by ruling on Nellis's suitability based upon his inability to violate his conscience, but he accurately observes that "the record clearly demonstrates that his views were anything but resolute." Nellis stated that he believed in the death penalty and could follow the law, but then stated that he could not take the oath and fulfill the duties of a juror. His answers were initially equivocal, and then were contradictory and vacillating depending on whether he was being questioned by the State or the defense. Therefore, we defer to the trial judge who was able to observe Nellis's demeanor and assess his capacity to serve as a juror in this case. Based on the totality of the voir dire testimony, the trial court did not abuse its discretion in granting the State's challenge for cause. *See Clark v. State*, 929 S.W.2d 5, 9 (Tex. Crim. App. 1996) (holding that, when a potential juror genuinely equivocates or vacillates, the trial court may discretionarily dismiss or not "depending on demeanor, intonation, or expression").

## 2. Trial Court Granted Challenge for Cause on Morrow

Appellant complains that the trial court erroneously granted the State's challenge for cause against prospective juror Morrow. Appellant argues that Morrow insisted she could follow the law regardless of the damage it would do to her conscience, and she was, therefore, not challengeable for cause. Appellant also argues that the trial court abused its discretion in applying an incorrect legal standard, specifically, "that such conscientious jurors cannot be 'forced' to follow a law that contradicts their belief systems."

Regarding Morrow's ability to follow the law, appellant's characterization of Morrow's voir dire answers is not entirely accurate. The State began its questioning of Morrow by clarifying her questionnaire responses regarding the death penalty. Morrow affirmed that she "would not want to" impose the death penalty under any circumstances and that she "could not vote for the death penalty regardless of the facts and circumstances of the case." Upon further questioning by the State, Morrow asserted that "there is a difference between sitting in judgment of someone and then also choosing the death penalty." When asked by the State whether she could sit on a death penalty case, Morrow then indicated, "No, I can sit in judgment on this case as well. I just – I would just not opt for [death] as the punishment."

When questioned by defense counsel, Morrow indicated her understanding of the difference between the two phases of trial and stated that if the evidence indicated guilt, she could find someone guilty of capital murder. She also stated that if she "believed there was no mitigating evidence, [she] would say that," knowing that the defendant would receive the death penalty. Morrow then affirmed that she could take the oath and render a true verdict according to the law and the evidence.

Upon further questioning, the State attempted to clarify Morrow's answers, and she reiterated, "I would want to not be put in the position where I needed to – where if I had to say, you know, if my answer was going to put someone with a death penalty." The State followed up by asking, "Okay. So in light of that, are you saying that you could not take the

oath since taking the oath would put you in the position of possibly having to assess the death penalty?" Morrow responded affirmatively.

Appellant cites to the State's rejection of defense counsel's subsequent questions to Morrow regarding her ability to take the oath, including Morrow's reaffirmation that "I did say that I would and that was before – before she kind of explained the difference . . ." of counsels' questions to her. The trial court then said, "I will let her answer and we will figure it out from there." Morrow responded, "I suppose in that case the correct answer would be no." Defense counsel again attempted to clarify Morrow's answer of whether she could take the oath by asking the following:

Q. Explain that to me. We have asked so many questions. You have been accepted as a juror, you are over there and the judge says raise your hand and take the oath. Would you do it or not do it?

A. Well, I don't think I would even be in that situation. I mean that is why we are having this conversation now.

Q. I have very few abilities, but as far as asking the question, I can put you in that position.

A. In that case the answer would be no.

The trial court ultimately granted the State's challenge for cause, stating, "So I believe based on all the answers including her final answer when everyone had a go back and forth, that she couldn't take the oath if that was an option, and therefore I am compelled to grant the challenge."

Appellant cites to the trial court's recap of Morrow's statements and an earlier statement regarding the inability to force jurors to violate their belief systems as implying application of an improper legal standard. But the trial court clarified, prefacing its ruling on the challenge for cause that, "My job as I see it is to try to weed through all that [phrasing] and look at the juror [] based on the answers and the demeanor and the way in which they answer [the questions]." Morrow's answer to the question of whether she could take the oath and fulfill the duties of a juror changed each time the parties sought clarification. Ultimately, she responded in the negative – a response that was accepted by the trial court. The trial court was in the best position to evaluate Morrow's demeanor and responses in determining whether her views would substantially impair her ability to perform her duties as a juror in accordance with the trial court's instructions and her oath. *See id.* at 9. Considering the totality of Morrow's voir dire testimony, we determine that the trial court did not abuse its discretion in granting the State's challenge for cause. *See id.*

### 3. Trial Court Granted Challenge for Cause on Crowe

Appellant next complains that the trial court erroneously granted the State's challenge for cause against prospective juror Crowe. Appellant argues that Crowe "clearly indicated her ability to honestly answer the questions based on the evidence."

The full record of Crowe's testimony, however, indicates that she consistently equivocated. During questioning by the State, Crowe stated that, even though she recognized that the death penalty is an available punishment under the law, she did not think that she

could cast a vote that would lead to someone's execution.  She further affirmed her answer on the juror questionnaire that she would not vote for the death penalty regardless of the facts and circumstances of the case.  The State pointedly asked, "[W]hether you can tell us and tell the judge that you can and that you will follow the law as it relates to the death penalty, and so on that issue, you are telling us that you cannot do it?"  Crowe responded, "I really am not sure."  She followed that up with, "Honestly . . . I don't know."

On four different occasions during her voir dire testimony, Crowe stated that she did not think she could take the oath.  The trial court attempted to elicit a firm response, and the State followed up by asking:

Q.      All right.  And you have also told us that you could not take the oath if the law required you to consider giving someone a death sentence?

A.      No, ma'am.

But when defense counsel asked similar questions, Crowe responded differently.  Crowe told defense counsel that she could answer the special issues truthfully, despite her difficulty in participating and desire not to answer.  In light of the inconsistent responses, the trial court attempted to clarify whether Crowe could take the oath and truthfully answer the special issues, and she answered as follows:

Q.      [By the trial court] Let me ask you something here because I am unclear.

A.      Yes, sir.

Q.      Because if I heard you right, you told the State you couldn't do it and you told [defense counsel] you could do it.

A.     I think I am getting confused myself. I'm sorry.

Q.     [Defense counsel] asked you if you could take the oath, be a juror and answer those questions honestly, and you said you could. As I heard, the State asked you the same question and you said you couldn't.

A.     I think it was the way it was put[,] too. I don't feel like I could take – honestly answer those questions putting someone to death, but if I were chosen, I would answer them as truthfully as I could, but if it is –

Q.     Understanding that it would put somebody to death if you answered them in a certain way.

A.     No, sir. I'm sorry.

Q.     I am further confused because I think [defense counsel] actually stated his questions[,] I thought[,] fairly clearly. Maybe you heard them somewhat differently. But the way he – what he asked was if you – assuming you took the oath and were a juror, and those questions were presented and you looked at the evidence and they led you beyond a reasonable doubt to a guilty verdict and then they led you beyond a reasonable doubt to answer [the] future danger, yes, and then you didn't see any mitigation, you could answer the question honestly[, ] 'I don't see any mitigation so I vote no knowing that this court would have to sentence him to death.' You told him you could do that, but you told the State you couldn't.

A.     I really cannot put someone to death.

Q.     You couldn't?

A.     So I'm sorry, I was confused. I could not actually answer – if that is just it, cut and dried, can I answer a question to put him to death, no.

The trial court reiterated that Crowe's answer was "regardless of the evidence," and she responded, "I don't believe I could." The trial court then demanded, "I am putting you to a yes or no answer," and Crowe answered, "No."

Crowe's answers regarding whether she could take the oath and fulfill the duties of a juror were contradictory and vacillating depending on whether she was being questioned by the State or the defense. Ultimately, the trial court was in the best position to evaluate Crowe's demeanor and responses in determining whether her views would substantially impair her ability to perform her duties as a juror in accordance with the trial court's instructions and her oath. *See id*. at 9. Considering the totality of the voir dire testimony, we determine that the trial court did not abuse its discretion in granting the State's challenge for cause. *See id*.

### 4. Trial Court Granted Challenge for Cause on Fagan

Appellant complains that the trial court erroneously granted the State's challenge for cause against prospective juror Fagan. Appellant argues that "Fagan repeatedly and consistently indicated she could set aside her personal and religious beliefs and serve as an honest juror."

At the beginning of her individual voir dire, Fagan stated that she could set aside her religious and personal beliefs opposing the death penalty if she were chosen to sit on the jury. However, upon further questioning, she acknowledged that she would not be able to overcome her belief system in order to take the oath and answer the special issues honestly. When asked again by the State if she felt her beliefs would substantially impair her performance as a juror, Fagan replied affirmatively.

Defense counsel then questioned Fagan about whether she could take the oath and about her ability to answer the individual special issues. Fagan stated, "If it is somebody else's decision and I am not involved personally, I am able to look at it in one light." She, however, admitted, "[W]hen it is my decision and I am the one responsible for the end result, it unfortunately clouds my ability." The trial court then asked Fagan directly, "So given that, can you answer his question? Could you or not?" Fagan responded, "No." The trial court granted the State's challenge for cause, remarking that "based on her last clear response, I have to grant [it]."

The record shows that, while Fagan initially indicated that her beliefs would not impair her ability to take the oath and serve as a juror, she ultimately indicated that she would not be able to do so and thus equivocated. The trial court was in the best position to evaluate Fagan's demeanor and responses in determining whether her views would substantially impair her ability to perform her duties as a juror in accordance with the trial court's instructions and her oath. *See id.* at 9. Considering the totality of the voir dire testimony, we determine that the trial court did not abuse its discretion in granting the State's challenge for cause. *See id.* Point of error three is overruled.

**B. Trial Court Properly Disallowed Certain Commitment Questions**

In points of error four, five, and six, appellant alleges that the trial court erred when it prohibited him from asking proper questions during voir dire. We conclude, however, that

the trial court properly restricted appellant's voir dire in its rulings disallowing certain commitment questions.

**1. Law Does Not Permit Improper Commitment Questions**

We review a trial court's ruling regarding the limitation of voir dire questioning for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). In this review, our focus is on whether appellant proffered a proper question regarding a proper area of inquiry. *Id*. A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). Often a commitment question requires a "yes" or "no" answer, and the answer commits a juror to resolve an issue in a particular way. *Id*. Yet, commitment questions may also be open-ended when they prompt a prospective juror to set the hypothetical parameters for her decision-making. *Id*. at 180. Not all commitment questions are improper, however. *Id*. at 181. When the law requires a certain type of commitment from jurors, such as considering the full range of punishment, an attorney may ask prospective jurors to commit to following the law in that regard. *Id*.

Should a proffered question be erroneously denied during individual voir dire, the error is subject to a harm analysis. *See, e.g., Woods v. State*, 152 S.W.3d 105, 109 (Tex. Crim. App. 2004). We have found no harm in cases in which the record reflects that counsel was able to ask the venireman a question that was "essentially the same" as the denied

question, or to elicit the same information that the denied question sought to elicit. *See id.* at 110; *Rachal v. State*, 917 S.W.2d 799, 815 (Tex. Crim. App. 1996).

**2. Trial Court Properly Disallowed Open-Ended Questions**

In points of error four and five, appellant alleges that "[t]he trial court indicated early on that it would not permit counsel to ask the panel members the type of open-ended questions he attempted to ask" prospective juror Neveu.[4]

But the record supports neither the claim that the trial court forced defense counsel to change the questions nor that such voir dire questions were proper. Specifically, defense counsel asked Neveu, "What do you think in your mind, not this case or even this particular kind of capital murder, capital murders in general, what would you be looking for in terms of what might be mitigation evidence?" The State objected. In his brief, appellant complains that the trial court "required counsel to rephrase the question." However, the record shows that defense counsel immediately offered to rephrase the question before the trial court ruled on the State's objection. The trial court later advised defense counsel that:

> [Court]:   [Counsel], [a] trial court does not err in refusing permitting [sic] defense to ask venire person[s] what sort of things or circumstances could lessen a person's moral culpability. They consider that to be close to a commitment question. So long as you [keep] it the way you rephrased it, I think that is okay.
>
> . . . .

---

[4]   Appellant's point of error additionally contends that failure to permit proper voir dire questioning "constitutes structural error" or, alternatively, constitutional error under Texas Rule of Appellate Procedure 44.2(a). *See* TEX. R. APP. P. 44.2(a). Because we find appellant's counsel's questions were not proper, we refrain from addressing this contention.

[Defense]:    The way I rephrased it, is that all right?

[Court]:    I think so.  Okay.

The trial court accurately determined that it is a commitment question to ask a prospective juror to describe, in hypothetical terms, what he considers to be "mitigation evidence." *See Davis v. State*, 349 S.W.3d 517, 519 (Tex. Crim. App. 2011) (distinguishing the death-penalty context regarding open-ended questions because narrower range of punishment means that "inquiries into what will influence [jurors'] decision are more likely to require commitments"); *Barajas*, 93 S.W.3d at 39 (holding that voir dire questions "so vague or broad in nature as to constitute a global fishing expedition" not "proper"); *Standefer*, 59 S.W.3d at 180 & n.7, 9 (contrasting the improper open-ended question "What circumstances in your opinion warrant the imposition of the death penalty?" and the proper question "Do you think there might be circumstances that would mitigate against the death penalty?").  We conclude that the trial court did not err by disallowing the improper commitment questions. *Barajas*, 93 S.W.3d at 38 (holding that trial court abuses its discretion only by "prohibit[ing] a proper question about a proper area of inquiry").

Appellant further alleges in points four through six that the trial court erred when it prohibited him from asking about the types of mitigating evidence prospective jurors would find relevant during sentencing, as well as what types of evidence they would find relevant to the determination of future dangerousness.  But the law does not require that a juror consider any particular piece of evidence as mitigating. *Raby v. State*, 970 S.W.2d 1, 3 (Tex.

Crim. App. 1998). The law requires only that defendants be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating. *Id*. Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry. *Standefer*, 59 S.W.3d at 181. Further, we have consistently stated that a jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *See Freeman v. State*, 340 S.W.3d 717, 725 (Tex. Crim. App. 2011).

### 3. Trial Court's Rulings on Specific Jurors Were Proper

Appellant complains about the voir dire of prospective juror Kemp. When defense counsel asked Kemp to provide examples of cases in which life imprisonment would be more appropriate than the death penalty, the State objected on the ground that this was a commitment question. Appellant again complains on appeal that the trial court "ordered counsel to rephrase the question." A review of the record, however, shows that defense counsel offered to rephrase the question prior to the trial court's ruling, and the trial court never ruled on the State's objection. Because defense counsel rephrased the question on his own initiative, appellant cannot show that the trial court erroneously denied him the opportunity to ask proper questions. *Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App. 2003) ("To preserve error, appellant must show . . . prevent[ion] from asking *particular* questions that were proper.") (emphasis original); *Barajas*, 93 S.W.3d at 38.

Appellant also complains that the trial court did not permit defense counsel to ask prospective juror Johnson whether she could conceive of any mitigating evidence that would make her believe a defendant was deserving of life rather than the death penalty. The State objected, "All the law requires is that she keep her mind open to the possibility that there may be mitigating evidence." The trial court ruled, "I sustain the exact form of the question, but not the spirit of the question, I understand, but the form I think is susceptible to an objection." As phrased, it appeared that defense counsel was asking for a commitment about a type of mitigation evidence as opposed to whether the juror could ever consider mitigation in any case. *See Barajas*, 93 S.W.3d at 39; *Standefer*, 59 S.W.3d at 182–83 & n.7, 9 ("[W]hether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry."). The trial court did not place a limit on the substance of appellant's question, only the form, and appellant was not prohibited from eliciting the information he sought.

Finally, appellant complains that the trial court erred in sustaining the State's objections to two questions he posed to prospective jurors Johnson and Franke concerning future dangerousness. Specifically, defense counsel asked prospective juror Johnson: "What would you be looking for . . . to try to find out whether somebody would be a future danger or not?" Similarly, defense counsel asked prospective juror Carolyn Franke: "[I]f you saw a defendant's criminal history record, [in] . . . a hypothetical case . . . would that be helpful to you in deciding that issue?" Appellant argues that these questions were proper because

they were aimed at discovering any pre-existing bias that would cause these jurors to automatically find that a defendant convicted of capital murder is a future danger to society.

In response to the State's objection to defense counsel's question to Johnson, the trial court directed defense counsel to rephrase the question to "discuss the issue more fully." Counsel then followed the trial court's direction and asked a series of questions that were much more clearly articulated to elicit the information. Thus, defense counsel was able to obtain the same information in a proper format. We cannot conclude that the trial court abused its discretion by sustaining the State's objection, directing defense counsel to rephrase the question, and permitting the rephrased questions on the same topic. *See Woods*, 152 S.W.3d at 110; *Rachal*, 917 S.W.2d at 815.

Appellant insists that the question asked of Franke was not a commitment question because defense counsel did not specifically ask Franke whether she would rely on a criminal history to decide the future dangerousness special issue, but whether she would consider it. In actuality, defense counsel asked Franke if a particular type of evidence – a criminal history – would help her in determining the special issue. *See Standefer*, 59 S.W.3d at 180 (finding "the word 'consider' often marks a commitment question"). The jury is tasked with considering all evidence in making its decision. As the trial court pointed out, by this time in Franke's voir dire, she had already indicated that she would consider all the evidence. It was not proper for defense counsel to ask Franke if she found a particular type of evidence to be helpful because, as phrased in this case, it was a back-door way of asking Franke to

commit to how she would weigh a particular type of evidence, namely, a defendant's criminal history. *See id*. at 182–83 & n.7, 9 ("[W]hether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry."). We conclude that the trial court did not abuse its discretion in sustaining the State's objection. Points of error four through six are overruled.

### C. Complaint Regarding Denial of Defense Challenges For Cause Not Preserved

In point of error seven, appellant complains that the trial court improperly denied his challenges for cause against prospective jurors Johnson and Tieman. To preserve error for a trial court's erroneous denial of a challenge for cause, a defendant must show that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of prospective juror; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *See Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010) (citing *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996)).

In a death penalty case with only one defendant, a defendant is entitled to fifteen peremptory challenges. *See* TEX. CODE CRIM. PROC. art. 35.15(a). The record shows that appellant used all fifteen of his peremptory challenges. He requested and was granted one additional peremptory challenge, which he used. The record reflects, however, that appellant did not identify to the trial court an objectionable juror who sat on the jury against whom he would have used any additional peremptory challenge. Further, appellant does not identify

such a juror in his brief. Therefore, appellant has not shown that he preserved his complaint regarding the exclusion of these jurors. *Davis*, 329 S.W.3d at 807. We overrule point of error seven.

## V. Admissibility of Scientific Evidence at Guilt/Innocence Trial Phase

Appellant's points of error eight through thirteen contend that the trial court reversibly erred by admitting evidence on fingerprints, DNA, and shoe prints. We disagree.

### A. Fingerprints

In points of error eight, nine, and ten, appellant alleges that the trial court erroneously admitted fingerprint evidence that was tested after trial began in violation of *Daubert/Kelly* and in violation of his rights to due process and due course of law. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592–93, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992).

During the initial investigation, several latent fingerprints were collected from Bianca's apartment, including a print found on the bottle of lotion found near her body. Sandra Siegel, a latent-print examiner with the Austin Police Department, reviewed the collected prints and compared them to known prints from appellant and Bianca. In September 2009, Siegel prepared a report indicating that no match had been made to the known prints of appellant or anyone else.

The day before the State began its case-in-chief, the prosecutor asked Siegel to compare the as-yet unidentified prints to known prints of Bianca's mother and sister. In the

process of doing that, Siegel decided on her own initiative to attempt another comparison of the unidentified prints to appellant's known prints. Siegel was able to match appellant's left ring finger to the partial print collected from the lotion bottle. Siegel created a supplemental report and submitted it to the prosecutor. The prosecutor forwarded the report to defense counsel approximately an hour later and then, with defense counsel's consent, notified the trial court of these same events.

At the guilt/innocence phase of appellant's trial, Siegel testified that the initial misidentification occurred because she missed an orientation clue during her preliminary review of the print. She had incorrectly concluded that the print was made by the right hand, rather than the left. A second latent-print examiner, Richard Pickell, subsequently verified the match.

In point of error eight, appellant complains that the fingerprint evidence does not meet the *Daubert/Kelly* requirements for the admissibility of evidence because the print match was not from appellant's palm or fingertips, but instead was from the middle joint of one of appellant's fingers. As support for his argument, appellant cites Siegel's testimony regarding the lack of a joint- or palm-print database akin to the fingerprint database maintained by the Federal Bureau of Investigations. Furthermore, appellant emphasizes Pickell's testimony that a print from that portion of the finger lacks complexity and that there are no scientifically accepted number points of comparison to support his contention that the print is "lacking in clues and characteristics" sufficient to reasonably satisfy the admissibility standards.

A trial court's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement. *Davis*, 329 S.W.3d at 803, 814–15; *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). Admission of expert testimony is governed by Rule 702 of the Texas Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702; *see Morales v. State*, 32 S.W.3d 862, 865 & n.4 (Tex. Crim. App. 2000). For expert testimony to be admissible under this rule, the party offering the scientific expert testimony must demonstrate, by clear and convincing evidence, that such testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly*, 824 S.W.2d at 572; *see also Daubert*, 509 U.S. at 593 n.11 (testimony must be based on scientific knowledge and assist trier of fact in understanding evidence or determining fact in issue). In other words, the proponent must prove that the testimony is based on a reliable scientific foundation and that it is relevant to the issues in the case. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997).

The trial court held a hearing outside the presence of the jury to determine the admissibility of the fingerprint evidence. Both Siegel and Pickell testified at the hearing. Both testified regarding their respective experience and expertise in the field of fingerprint analysis, and both stated that fingerprint analysis is recognized and accepted as valid in the

scientific community. Siegel testified about the techniques and procedures used in analyzing fingerprints, and further testified that she followed those techniques and procedures when analyzing appellant's prints.

Upon questioning by the trial court, Pickell testified as follows:

Q.    [By the trial court] Was that a print that in your science and your expertise was capable of being printed and identified just like any other latent print?

A.    Well, yes, but it was a – it was part of the – what we call sort of a joint finger, so it is not like in a pattern in a normal area that you look at for a fingerprint or in – we have the ridge structure in the palms. It is in sort – it was in a joint finger so it is – it is not an area that has a lot of clues in it so it is not real complex, but it is something that you have to run the ridges and go through it all and make sure that you have sufficient number of characteristics to identify it.

Q.    So using your expertise and the accepted methods within your profession, is that a latent print that you can confidently use and in your expertise identify if you have enough points?

A.    Yes.

Q.    Just like any other?

A.    Very much so.

Q.    That is not uncommon or unheard of or outside the norm in your business?

A.    No, it is not.

. . . .

Q.    In making this identification, did you utilize the same expertise you utilize to the same degree of certainty that you do in identifying any other print?

A.      Yes, I did.

According to Pickell's testimony, the identification of a latent print from an area other than the tip of the finger is not novel. Pickell expressed confidence in the ability to use a print from the area he called the "joint finger" for identification. The testimony showed that the proffered evidence was based on a reliable scientific foundation. The trial court's decision to admit the complained-of fingerprint evidence was not outside the zone of reasonable disagreement. *Bigon*, 252 S.W.3d at 367. Point of error eight is overruled.

In point of error nine, appellant further complains that the admission of the fingerprint evidence violated his right to due process of law. U.S. CONST. amend. V, IV. In point of error ten, appellant also asserts that his right to notice under the Texas Constitution, article I, section 19, was violated by admission of the complained-of fingerprint evidence. TEX. CONST. art. I, § 19. Appellant specifically complains that he was unfairly surprised because he was not made aware that appellant's known prints were matched to a print from the crime scene until three days into the presentation of the State's case-in-chief. Appellant complains that the State violated the discovery order and created a situation in which the defense had no time to counter the evidence. During trial, appellant raised a due-process objection but did not object on the basis of the Texas Constitution.

Evidence willfully withheld from disclosure under a discovery order should be excluded from trial. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000). In this case, however, the defense was made aware of the evidence within an hour of the

prosecutor becoming aware of its existence. There is no indication in the record that Siegel's initial failure to identify appellant's print, and later successful identification of it, was a willful or bad faith withholding of evidence. Although appellant did not specifically object to lack of notice, the trial court offered a continuance to the defense to allow independent expert examination of the evidence, but appellant refused this offer. The trial court additionally offered to make an independent expert available to the defense for this purpose, and appellant refused it. Furthermore, appellant agreed on the record that the State had not acted in bad faith.

The failure to request postponement or seek a continuance waives any error urged on appeal on the basis of surprise. *See Duff-Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985); *see also Oprean v. State*, 201 S.W.3d 724, 730 n.10 (Tex. Crim. App. 2006) (Cochran, J., concurring) (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982)). Because appellant affirmatively waived the trial court's offer of a continuance, he cannot complain of surprise on appeal. Points of error nine and ten are overruled.[5]

**B. DNA**

In points of error eleven and twelve, appellant complains that the trial court erred in admitting the testimony from the State's expert regarding DNA and the statistical analysis used in DNA testing. Appellant argues in point of error eleven that the State failed to meet

---

[5] Given our disposition above of appellant's due course of law argument under the Texas Constitution, we refrain from deciding whether appellant showed under *Cobb v. State* that the Texas due course constitutional right, in this context, should be interpreted as providing any greater right than the federal Due Process guarantees. 85 S.W.3d 258, 268 (Tex. Crim. App. 2002).

the *Daubert/Kelly* requirements. The record shows that appellant did not object to the admission of the DNA evidence on the basis that it did not meet the *Daubert/Kelly* requirements, thus failing to preserve this complaint for appellate review. *See* TEX. R. APP. P. 33.1(a). Therefore, point of error eleven is overruled.

In point of error twelve, appellant complains that the State failed to include and use a central Mexico database when calculating the random match probability statistics for the DNA evidence that was admitted at trial. During trial, appellant objected that the statistical results derived in the testing were improperly skewed as a result of not using a "Mexico database." Defense counsel attempted to clarify the objection to the evidence by stating the following:

> Just in terms of our objection, we are not arguing, as the court points out, about the good science in that area. Basically what our – what we would ask the court to do is indicate that – where there is a DNA conclusion, that – an exclusion, that that is admissible in all cases. When a person cannot be excluded, then that is the testimony that we would like it limited to; that when we go beyond this person cannot be excluded to these astronomical numbers that really are based on formulas that are beyond my comprehension, and I have [tried] my best, that it is unfairly giving the jury an impression, even if properly stated, and not using the prosecutor's fallacy they call it or the defendant's fallacy in this DNA area, that is still – that is what we are asking for.

On appeal, appellant complains that the genetic samples collected in this case were compared to a generalized database that included representatives of the Hispanic ethnic group divided into two categories: southwestern Hispanics, comprised of those from Central and South America; and southeastern Hispanics, comprised of those originating in the

Caribbean Islands and other diverse African subgroups. Appellant argues that the two subgroups are not adequately divided to account for the different allele frequencies found within distinctly different genetic subgroups. Appellant contends that any comparison of himself and Bianca, both of whom are of central Mexican descent, to such a generalized database is not a mathematically sound basis for statistical comparison. Ultimately, appellant argues that any calculations based on comparison with the generalized database results in padded, unreliable numbers.

The State's witness, Professor Mitchell Holland, addressed appellant's argument during the *Daubert/Kelly* hearing as follows:

> You are always going to have variance around numbers. There is no question you are going to have variance around any sampling process. So your evaluation is an evaluation of the amount of variation within those population groups as opposed to between those population groups, and as you are making those assessments, what you find is that the vast majority of the variance is within each of those population groups, so there is very little variance between them.

> So whether it is a Hispanic population example or a European, African origin, you are going to see fluctuation in any one of the frequencies of any of those numbers up and down[.]

>  . . . .

> That is going to happen across every single one of the numbers that are looked at. Some will go up. Some will go down.

> Typically what you see is the averaging across those – that minor variance translates into very little difference when you get up to the final number.

In light of this testimony, the trial court did not err in finding that the State met its burden to demonstrate that the random-match probability statistics were sufficiently relevant and reliable to help the jury to reach accurate results. *Kelly*, 824 S.W.2d at 572; *see also Daubert*, 509 U.S. at 592. Point of error twelve is overruled.

## C. Shoe Prints

In point of error thirteen, appellant complains that the trial court erred in admitting shoe-print evidence that was "not shown to be sufficiently reliable in either collection or analysis." The State called Melissa Valadez, a section manager in the Department of Public Safety (DPS) crime laboratory's trace-evidence section, to testify about a shoe print found at the crime scene. Valadez testified that she examined the shoe print found at the scene and compared it to appellant's shoe. On cross-examination, Valadez testified that, when examining shoe impressions, there are two areas of comparisons: class and accidental characteristics. Class characteristics are characteristics shared by a group, including size, tread, pattern, and shape. Accidental characteristics are characteristics that are imparted once a shoe is worn, such as cuts, nicks, cracks, rocks, gum, and wear pattern. When questioned by defense counsel, Valadez stated that only class characteristics were present and that DPS did not fully assess a tread pattern. She opined that appellant's shoe could not be excluded as a possible contributor to the shoe print found at the crime scene.

This Court has previously recognized the general admissibility of shoe-print comparison evidence. *See Rodgers v. State*, 205 S.W.3d 525, 532 (Tex. Crim. App. 2006).

We have stated that the reason that this kind of testimony is liberally allowed is that the field of shoe-print comparisons is not particularly complex, the witness's opinions are not conclusive, and consequently, they are generally not pivotal to the resolution of the case. *Id*. at 533.

In this case, the jury heard descriptions of the physical comparisons upon which Valadez based her conclusions. The exhibits relied on by Valadez for her physical comparisons were admitted into evidence and available to the jury during its deliberations. The jury could determine the weight and credibility to give to Valadez's testimony and the likelihood that other individuals with shoes similar to appellant's might have made the print found in Bianca's apartment. There was also an abundance of other evidence before the jury; this one piece was not dispositive. Under the circumstances, we find that the trial court did not abuse its discretion in admitting the shoe print evidence. *See Bigon*, 252 S.W.3d at 367. Point of error thirteen is overruled.

## VI. Punishment-Phase Evidence

In points of error fourteen through eighteen, appellant challenges the trial court's admission of certain evidence in the punishment phase of trial, but we conclude that his complaints are without merit.

### A. Extraneous Bad Acts and Photos of Tattoos

In point of error fourteen, appellant alleges that the trial court abused its discretion in failing to exclude testimony regarding extraneous bad acts during the punishment phase

because the State failed to meet its burden of proving that the evidence was admissible and the trial court failed to hold preliminary hearings on a majority of the witnesses' testimony. Appellant also complains that he was unfairly prejudiced by the admission of photographs of his tattoos under Texas Rule of Evidence 403. *See* TEX. R. EVID. 403.

**1. Law Pertaining to Punishment-Phase Evidence in Capital Cases**

In capital cases, the admissibility of extraneous-offense evidence offered during the punishment phase is governed by Texas Code of Criminal Procedure Article 37.071, section 2(a). *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(a); *Hughes v. State*, 24 S.W.3d 833, 843 (Tex. Crim. App. 2000). Article 37.071 states, "In the [punishment phase] proceeding, evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence . . . ." TEX CODE CRIM. PROC. art. 37.031, § 2(a). This article affords trial courts wide latitude in admitting or excluding evidence of extraneous offenses during the punishment phase of a capital trial. *Hughes*, 24 S.W.3d at 843. Before the evidence can be declared admissible, however, "the State is burdened with the obligation of 'clearly proving' to the trial court that the extraneous offense was committed and that appellant was the perpetrator." *Id*. In capital cases, the State need not prove beyond a reasonable doubt that the defendant committed an extraneous offense or bad act for that evidence to be admissible at the punishment phase. *See Kutzner v. State*, 994 S.W.2d 180, 188 (Tex. Crim. App. 1999); *Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994) (citing *Adanandus v. State*, 866 S.W.2d 210, 233–34 (Tex. Crim. App. 1993));

*see also Huizar v. State*, 12 S.W.3d 479, 482 n.3 (Tex. Crim. App. 2000) (noting beyond-a-reasonable-doubt instruction not required in capital cases "where the jury is instructed they must find the special issues beyond a reasonable doubt"). "It is enough that the State presents evidence that, if believed, establishes that the defendant himself committed the extraneous conduct." *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). We, thus, evaluate the trial court's determination of admissibility solely to determine whether it falls within the zone of reasonable disagreement. *Hughes*, 24 S.W.3d at 843. Here, appellant complains of extraneous-bad-act testimony from several witnesses.

### 2. Testimony by Cruz Family

Appellant contends that the trial court erred in admitting the testimony of Catalina Cruz, the sister of appellant's friend, and Cruz's daughter, Jennifer. Appellant argues that Cruz's testimony should have been excluded because she did not follow through on a police report about the incident. The trial court held a hearing outside the presence of the jury prior to admitting the testimony. Cruz testified that on February 11, 2007, appellant knocked on her door at two in the morning until she eventually answered. When she answered the door, appellant grabbed her by the neck and pushed her against the wall while holding a screwdriver to her throat. Jennifer witnessed the assault and attempted to call 9-1-1. Cruz testified that she knew appellant prior to the attack and that she could clearly identify him as her assailant because the lights were on at the time. The record reflects that Cruz knew appellant prior to the attack, recognized him as her attacker, and demonstrated good memory

of the incident. We conclude that the admission of Cruz's testimony is not outside the zone of reasonable disagreement. *Hughes*, 24 S.W.3d at 843.

### 3. Testimony by Former Girlfriend Moreno

Appellant also complains that the trial court erroneously admitted the punishment testimony of his former girlfriend Moreno. The parties held a bench conference prior to Moreno's testimony, during which the State gave a brief proffer of Moreno's testimony that appellant had forced her to engage in anal intercourse, that she had observed him using and dealing cocaine, and that he had difficulty ejaculating when he was under the influence of cocaine. The trial court determined that her testimony regarding appellant's cocaine use and the forced anal intercourse was admissible. Evidence relating to drug use can be relevant to the issue of future dangerousness. *See Devoe v. State*, 354 S.W.3d 457, 475 (Tex. Crim. App. 2011); *Jenkins v. State*, 912 S.W.2d 793, 817–18 (Tex. Crim. App. 1993). Appellant's history of forcing non-consensual intercourse was similarly relevant as evidence of future dangerousness, particularly under the circumstances of this case that show that the victim was killed in the course of a sexual assault. *See Patrick v. State*, 906 S.W.2d 481, 488 (Tex. Crim. App. 1995); *Hughes*, 24 S.W.3d at 843. The trial court's decision to admit Moreno's testimony was not outside the zone of reasonable disagreement.

### 4. Complaints Not Preserved at Trial

Appellant complains about the admission of testimony from his former wife Angelica Escobar that appellant beat her multiple times. Any complaint relating to Escobar's

testimony, however, has not been preserved for appellate review because appellant never objected to her testimony. *See* TEX. R. APP. P. 33.1(a).

Appellant additionally complains that the trial court erroneously admitted the testimony of Xenis Prudencio, who said that appellant, a family friend, attacked her in her apartment in the early morning hours of March 25, 2009, after she had rebuffed his sexual advances the previous evening. Appellant never objected to Prudencio's testimony. Therefore, appellant did not preserve this complaint for appellate review. *See* TEX. R. APP. P. 33.1(a).

### 5. Photos of Appellant's Tattoos

Appellant argues that the trial court erroneously admitted photographs of appellant's tattoos of (1) the Roman numeral "IV", which, according to testimony, was evidence of his association with the gang known as the 4th Street Brothers, (2) a skull with flames coming off of it, (3) a woman crying, and (4) a naked woman being embraced in a sexual manner from behind by a skeletal figure.

Evidence of gang association may be admissible if it is shown to be relevant to the issues in the case, such as future dangerousness during the sentencing phase in a capital case. *Davis*, 329 S.W.3d at 805 ("Future dangerousness is an issue that is relevant to the sentencing stage of a capital-murder trial."). To show the relevance of gang membership, the State must show (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the gang. *Id.*

The State satisfied this requirement by presenting testimony from Austin Police Department Detective Balderama. Balderama, who had previously testified as a gang expert, described the activities of the gang with which appellant was associated. These activities included "burglaries, burglaries of vehicles, auto thefts," as well as assaults, aggravated assaults, drug distribution, and shootings. Balderama testified that the gang was still active. Appellant's membership was demonstrated, in part, through presentation of photographs of him exhibiting gang signs with other gang members. Additionally, Balderama explained that the Roman numeral "IV" tattoo indicated appellant's membership in the gang. He further testified that other indicia of gang membership included self-admission, being involved or arrested with other known gang members, and being connected by information provided by various informants. The admission of photographs of appellant's tattoos, which tended to show his membership in a gang, was not outside the zone of reasonable disagreement. *Davis*, 329 S.W.3d at 805–06.

With respect to the other tattoos, appellant's brief fails to specify why they would be inadmissible. He suggests that they would inflame the jury's prejudice that he posed a continuing threat of sexual violence against women without requiring the State to prove the proposition beyond a reasonable doubt. The trial court, however, was within its discretion to decide that these tattoos had some probative value in the punishment phase of trial as evidence regarding future dangerousness as to appellant's views about death, sex, and women. *See Davis*, 329 S.W.3d at 805; *Patrick*, 906 S.W.2d at 488.

**6. Application of Rule 403 in Punishment Phase of Capital Trial**

Appellant suggests that the evidence admitted in the punishment phase of his trial should have been excluded under Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403; *see Young*, 283 S.W.3d at 877 (applying Rule 403 to trial court's admission of extraneous offense evidence in capital-murder appeal). "[A]ll evidence connecting a defendant with a particular crime is highly prejudicial . . . It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 bars its admission." *Young*, 283 S.W.3d at 877. Appellant is correct that the evidence in the punishment phase likely negatively impacted the jury's view of him, but he has not shown how any of this evidence caused unfair prejudice, which is necessary for exclusion of evidence under Rule 403 of the Rules of Evidence. *See id.*

The trial court did not abuse its discretion in admitting the complained-of extraneous-bad-act testimony and photographs of appellant's tattoos. *See id.* Point of error fourteen is overruled.

**B. Testimony of A.P. Merillat**

In point of error fifteen, appellant complains about the punishment-phase testimony of the State's witness A.P. Merillat, who was questioned about erroneous testimony that he had given at another defendant's capital murder trial. In that other defendant's trial, the case

was reversed on appeal for a new punishment hearing. *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010). Merillat testified that the outcome of the direct appeal in the other case "proves that our system works." Appellant contends that, combined with the prosecutor's questions accompanying Merillat's testimony, the testimony was improper and violated appellant's Eighth Amendment rights under the Supreme Court's ruling in *Caldwell v. Mississippi*. 472 U.S. 320, 328–29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). Furthermore, appellant's brief and oral argument cites the United States Fifth Circuit Court of Appeals's opinion in *Sawyer v. Butler* to argue that, under *Caldwell*, such errors need not be preserved at trial because the "essence of the doctrine of plain error is that a loss of fundamental rights outweighs the values behind the rules insisting upon an objection." *Sawyer v. Butler*, 881 F.2d 1273, 1285–86 (5th Cir. 1989) (citations omitted).

Appellant has not established that the testimony by Merillat rises to the level described by *Caldwell*. *See Caldwell*, 472 U.S. at 328-29. In *Caldwell*, the prosecutor urged the jury not to view itself as determining whether the defendant would die because a death sentence would be reviewed for correctness by the state supreme court. *Id*. at 323. The Supreme Court held that it violates the federal Constitution for the State to "minimize the jury's sense of responsibility for determining the appropriateness of death." *Id*. at 328–29, 341. In contrast to *Caldwell*, Merillat's testimony did not tell the jury that it would not be determining whether appellant would die. *Compare id*. at 340 (noting that "the prosecutor's remarks were quite focused, unambiguous, and strong. They were pointedly directed at the

issue" of the jury's role and responsibilities in capital sentencing). Rather, Merillat merely explained that in another capital murder case in which error had occurred, the appellate court reversed the conviction, and that this was evidence that the system worked. Nothing in his testimony suggested that the jury should abdicate its responsibility to decide whether appellant should be sentenced to death. The type of error at issue in *Caldwell* is not implicated here, and, therefore, appellant was required to preserve his complaint with an objection. Because he failed to object to Merillat's testimony at trial, appellant failed to preserve error. TEX. R. APP. P. 33.1(a). We overrule point of error fifteen.

In point of error sixteen, appellant argues that the trial court abused its discretion and violated his constitutional rights when it admitted Merillat's rebuttal testimony. During the punishment phase, the State called Merillat to testify in rebuttal to defense expert Larry Fitzgerald. In his brief, appellant lists twenty-four different instances in which he alleges that Merillat's testimony was beyond the scope of rebuttal and therefore improper. Appellant also notes that Merillat's testimony violated the trial court's order not to testify to specific instances of inmate bad behavior. *See* TEX. R. APP. P. 38.1(f). Our review of the record shows that, of the twenty-four instances listed, appellant objected only twice that Merillat's testimony was beyond the scope of rebuttal. Therefore, the twenty-two instances to which there was no objection have not been preserved for review. TEX. R. APP. P. 33.1(a). Although appellant lodged objections to the remaining two instances, that testimony was later repeated without objection. This Court has held that "overruling an objection to evidence

will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling," regardless of the introducing party. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004); *Valle v. State*, 109 S.W.3d 500, 508–09 (Tex. Crim. App. 2003). As a result, the subsequent admission of Merillat's testimony without defense counsel's objection cured the error, if any, in the admission of Merillat's previously objected-to testimony. *See Lane,* 151 S.W.3d at 192-93; *Leday*, 983 S.W.2d at 718. Point of error sixteen is overruled.

## C. Testimony of David Self

In points of error seventeen and eighteen, appellant alleges that Dr. David Self's prediction of future dangerousness, based on provisional diagnoses of sexual sadism and anti-social disorder, did not meet the requirements for admissibility and violated his constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Our review of the record does not reveal any instance in which appellant objected to Self's testimony on these grounds. Because appellant did not object, these complaints have not been preserved for review. TEX. R. APP. P. 33.1(a). Points of error seventeen and eighteen are overruled.

## VII. Conclusion

We conclude that appellant's challenges to his conviction for capital murder and to his sentence of death lack merit. We, therefore, affirm the judgment and sentence of the trial court.

Delivered: November 20, 2013
Do Not Publish